Case No. 24-11372-D

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

ANTHONY LESLIE and TANYEKA LESLIE,
Appellants-Plaintiffs,

v.

DAIMLER TRUCKS NORTH AMERICA LLC,
Appellees-Defendants.

---

Appeal from the United States District Court
for the Northern District of Georgia

### Appellants-Plaintiffs Anthony Leslie and Tanyeka Leslie's Principal Brief

Stephen G. Lowry
Andrew J. Conn
HARRIS LOWRY
MANTON LLP
410 E Broughton St
Savannah, GA 31401

Naveen Ramachandrappa
Joshua F. Thorpe
BONDURANT MIXSON &
ELMORE LLP
1201 W Peachtree St NW
Ste 3900
Atlanta, GA 30309

Ronnie L. Crosby
PARKER LAW GROUP
101 Mulberry St E
PO Box 487
Hampton, SC 29924

Samuel K. Morgan, Jr.
MORGAN LITIGATION
GROUP, LLC
135 E Main St
Lexington, SC 29072

*Attorneys for Appellants-Plaintiffs*
*Anthony Leslie and Tanyeka Leslie*

## Amended Certificate of Interested Persons & Corporate Disclosure

On May 6, 2024, Appellants-Plaintiffs Anthony Leslie and Tanyeka Leslie (the "Leslies") filed their Certificate of Interested Persons and Corporate Disclosure Statement. After the Leslies filed their Certificate, new counsel appeared on behalf of Appellee-Defendant Daimler Truck North America LLC ("Daimler"), and Daimler also filed Corrections and Additions to the Leslies' Certificate.

Thus, pursuant to Eleventh Circuit Rule 26.1-4, the Leslies submit this Amended Certificate of Interested Persons and Corporate Disclosure Statement. This Amended Certificate incorporates Daimler's Corrections and Additions. Otherwise, this Amended Certificate doesn't contain any new names.

The Leslies' counsel certify that the following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations (including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party) that may have an interest in the outcome of this particular case or appeal:

- Adle, Sarah G. [former counsel for Appellants-Plaintiffs]

- Atlantic Trucking Co., Inc. [recipient of non-party discovery requests]

- Bedford, Nicholas D.M. [counsel for non-party Atlantic Trucking Co., Inc.]

- Bondurant, Mixson & Elmore, LLP [law firm for Appellants-Plaintiffs]

- Conn, Andrew J. [counsel for Appellants-Plaintiffs]

- Crosby, Ronnie L. [counsel for Appellants-Plaintiffs]

- Daimler AG [former name of Mercedes-Benz Group AG]

- Daimler North America Corporation [former sole member of Daimler Truck North America LLC]

- Daimler Truck & Buses US Holdings LLC [current sole member of Daimler Truck North America LLC]

- Daimler Truck North America LLC [correct spelling of Appellee-Defendant]

- Daimler Trucks North America LLC [spelling of Appellee-Defendant in initial district court pleadings and as docketed by this Court]

- Davis, Kristy S. [former counsel for Appellants-Plaintiffs]

- Dennis Corry Smith & Dixon, LLP [law firm for non-party Atlantic Trucking Co., Inc.]

- Dixon, John D. [counsel for non-party Atlantic Trucking Co., Inc.]

- Drew Eckl & Farnham, LLP [law firm for Appellee-Defendant]

- Freightliner LLC [former name of Daimler Trucks North America, LLC]

- Grafton, Richard H. [counsel for Appellee-Defendant]

- Germer PLLC [law firm for Appellee-Defendant]

- Germer Beaman & Brown, PLLC [law firm for Appellee-Defendant]

- Harris, Jeffrey R. [counsel for Appellants-Plaintiffs]

- Harris Lowry Manton LLP [law firm for Appellants-Plaintiffs]

- Harris, Rebecca F. [counsel for Appellants-Plaintiffs]

- Leslie, Anthony [Appellant-Plaintiff]

- Leslie, Tanyeka [Appellant-Plaintiff]

- Leslie, Tanica [initial spelling of Tanyeka Leslie in district court pleadings]

- Lowry, Stephen G. [counsel for Appellants-Plaintiffs]

- Manton, Jed D. [counsel for Appellants-Plaintiffs]

- Marschalk, Barbara A. [counsel for Appellee-Defendant]

- Mead, Spencer P. [former counsel for Appellants-Plaintiffs]

- Mercedes-Benz Group AG [former owner of Daimler North America Corporation]

- Miller, Stevan A. [counsel for Appellee-Defendant]

- Morgan Litigation Group, LLC [law firm for Appellants-Plaintiffs]

- Morgan, Samuel K., Jr. [counsel for Appellants-Plaintiffs]

- Parker, John E., Jr. [counsel for Appellants-Plaintiffs]

- Parker Law Group [law firm for Appellants-Plaintiffs]

- Peters, Murdaugh, Parker, Eltzroth & Detrick, P.A. [former law firm for Appellants-Plaintiffs]

- Ramachandrappa, Naveen [counsel for Appellants-Plaintiffs]

- Ray, William M., II, Hon. [district court judge]

- Reed Smith LLP [law firm for Appellee-Defendant]

- Ross, Eleanor L., Hon. [initial district court judge]

- Thomas, Kennedy, Sampson & Tompkins LLP [law firm for Appellee-Defendant]

- Thorpe, Joshua F. [counsel for Appellants-Plaintiffs]

- Tompkins, Jeffrey E. [counsel for Appellee-Defendant]

- Walker & Morgan, LLC [former law firm for Appellants-Plaintiffs]

- Watterson, Kim M. [counsel for Appellee-Defendant]

Counsel for Appellants-Plaintiffs Anthony Leslie and Tanyeka Leslie further and specifically certify that Mercedes-Benz Group AG is a publicly traded company or corporation that has a potential interest in the outcome of this case or appeal and trades under the symbol "MBGYY";[1] and that Daimler Truck, AG is a publicly traded company or corporation that has a potential interest in the outcome of this case or appeal and trades under the symbol "DTG."

---

[1] We recognize that Daimler has represented that, "[a]s of December 2022, Mercedes-Benz Group AG is an entirely separate company." Daimler's Corrections & Additions at 2. However, because we don't know the terms of any separation between Daimler and Mercedes, we also don't know whether Mercedes may still have some potential interest in this case or appeal. So, out of an abundance of caution, we continue to list Mercedes as having a potential interest.

## Statement Regarding Oral Argument

This appeal arises from a products-liability action under Georgia law filed by Appellants-Plaintiffs Anthony Leslie and Tanyeka Leslie (the "Leslies") against Appellee-Defendant Daimler Truck North America LLC ("Daimler"). On January 31, 2017, Mr. Leslie was driving a 2005 Freightliner truck on I-16 eastbound in Bulloch County, Georgia, when he came upon slowed traffic and tried to avoid a collision with another Freightliner truck in front of him but was unable to do so. Because the truck's front axle moved rearward during the collision and breached the fuel tank, Mr. Leslie was engulfed in a fireball while still inside the cabin. Mr. Leslie suffered catastrophic injuries and burns to 90% of his body.

Because of Mr. Leslie's nearly fatal burn injuries, enormous medical expenses, and now life-long trauma, the Leslies assert products-liability claims against Daimler, the manufacturer of the 2005 Freightliner truck that Mr. Leslie was driving. The district court, however, granted summary judgment to Daimler. The issues on appeal involve whether a jury could properly find for the Leslies on their negligent failure-to-warn claims and their reckless-disregard design claims.

For at least four reasons, the Leslies request oral argument.

*First*, the record in this products-liability action, filed more than six years ago, is quite substantial. In terms of size alone, Daimler filed at least twenty-four exhibits in support of its motion for summary judgment. *See* R-267-03 to R-267-27

(MSJ Exhibits); R-269-1 to R-269-7 (MSJ Reply Exhibits).[2] The Leslies filed at least twenty-seven exhibits in opposition. *See* R-293-1 to R-293-27 (Opp'n Exhibits). Many of those exhibits were filed under seal. *See* R-269 (Daimler's Not. of Filing Under Seal); R-295 (Leslies' Not. of Filing Under Seal).

But there's substantial complexity as well. The Leslies rely on expert testimony from at least five witnesses: Kelly Kennett; Russell F. Dunn; Kenya F. Oduor; Richard Dyer; and Brian Herbst. Several of these witnesses have provided initial reports and supplemental reports, and have given depositions. *See, e.g.*, R-293-11 (Herbst Expert Report); R-293-20 (Herbst Suppl. Expert Report). And these witnesses discuss technical aspects of engineering and product manufacturing, such as "Improved Design Finite Element Analysis." R-293-11 at 3.

We could go on, but you get the picture. A products-liability case involving Class 8 truck that exploded in a fireball after common frontal collision necessarily involves a substantial and complex factual record. And given the complexity, oral argument would allow the lawyers to help the Court more efficiently understand the record. *Cf. Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 875 (8th Cir. 2005) ("We expect, particularly in complicated, fact-intensive cases, that counsel will aid our understanding of the record ....").

---

[2] We'll generally cite to the district court record as R-[doc. no.] at [page no. generated by the district court's e-filing system]. *See* 11th Cir. R. 28-5. For example, "R-8 at 3" means district court docket entry 8 at page 3.

*Second*, there are substantial and complex legal questions to answer as well. Among other things, this case will involve application of the Georgia Supreme Court's recent opinion in *Ford Motor Co. v. Cosper*, 893 S.E.2d 106, 109 (Ga. 2023). This opinion was released after the parties briefed summary judgment below, but just before the hearing in the district court. So, this appeal is the parties' first real opportunity to brief *Cosper's* application to these facts.

And as we contend, *Cosper* confirms that one of this Court's opinions, *Ivy v. Ford Motor Co.*, 646 F.3d 769 (11th Cir. 2011), is *not* binding or relevant precedent on the question of reckless-disregard design claims presented in this case. Indeed, one reason why the Northern District of Georgia certified questions to the Georgia Supreme Court in *Cosper* is precisely because of its belief that *Ivy* doesn't address reckless conduct but only addresses willful and wanton conduct. *See Cosper v. Ford Motor Co.*, 2023 WL 2374246, at *4 (N.D. Ga. Feb. 14, 2024) ("[I]n *Ivy*, the Eleventh Circuit cites the statutory exception in O.C.G.A. § 51-1-11 (c) ... but only analyzes the claim based upon willful and wanton conduct. .... The Court does not mention recklessness beyond its inclusion in the statute.").

We suspect that Daimler will disagree about *Cosper's* effect on *Ivy* or what *Ivy's* holding was independent of *Cosper*. And the district court certainly disagreed with us, as it relied heavily, if not exclusively, on *Ivy* to grant summary judgment on the Leslies' reckless disregard claims.

But that's the point—given the likely sharp disagreement over *Cosper's* effect on *Ivy* and that *Cosper* is a relatively new opinion from the Georgia Supreme Court, this Court should hear oral argument to help fully explore this issue, which will affect future cases well. *Cf. Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984) (Stevens, J., dissenting) ("Whenever this Court acts summarily, there is an increased risk that it will make a mistake. Without the benefit of full briefs and oral argument, an important issue may escape our attention.").

*Third*, the district court made a number of remarkable fact findings in this case that are contradicted by the evidence and, regardless, were for a jury decide. For example, the district court found that, "[a]s portrayed in countless T.V. shows and movies, the possibility of a vehicle catching on fire following a crash is common knowledge." R-337 at 25-26. Thus, according to the district court, "[o]bjectively speaking, the danger of a post-crash fire is open and obvious," and Daimler had no duty to warn of open and obvious dangers. *Id.* at 26.

But what are the TV shows and movies on which the district court relies? And how are those anything like the facts here? There's no answer to these questions because the district court didn't provide any citations, didn't provide any examples, and didn't rely on any record evidence of TV shows or movies.

As another example, the district court found that "Plaintiffs do not argue that the Driver's Manual was not made available to Mr. Leslie," R-337 at 28 n.7.

However, that's exactly what the Leslies argued: "[Daimler] is aware that the Subject Tractor is commonly driven by drivers who do not actually own the tractor and potentially **do not have access** to an operator's manual, but [Daimler] does not place any warnings on the Subject Tractor itself." R-293 (Leslies' MSJ Br.) at 2 (emphasis added). "Mr. Leslie was a driver, like many others, who did not own the Subject Tractor, **had no access** to the owner's manual, and had no warning of this foreseeable hazard—but [Daimler] did." *Id.* at 2-3 (emphasis added).

Those improper fact findings (and many, many more), are the foundation of the district court's opinion, and oral argument will help the Court sift through this sharply disputed case. Briefs alone wouldn't do justice to the issues in this case. *See, e.g.*, David M. O'Brien, *Storm Center: The Supreme Court in American Politics* 260 (5th ed. 2000) (quoting Justice Scalia as observing that "[t]hings can be put in perspective during oral argument in a way they can't in a written brief").

For those reasons, the Leslies ask that the Court grant oral argument.

# Table Of Contents

Amended Certificate of Interested Persons & Corporate Disclosure .................. C-1

Statement Regarding Oral Argument ....................................................... i

Table of Citations ..................................................................... viii

Statement of Jurisdiction ................................................................. x

Statement of the Issues ................................................................... 1

Statement of the Case .................................................................... 1

     1.     Statement of the District Court Proceedings ....................................... 2

     2.     Statement of the Facts ....................................................... 3

            A.     Mr. Leslie was involved in an ordinary frontal collision that ignited a fireball explosion and nearly killed him. ............. 3

            B.     Daimler knew that its design choices created a heightened risk of fuel-fed fire in frontal collisions. ................. 5

            C.     Daimler was aware of, but rejected, several safer alternative designs of the fuel system. ........................ 6

            D.     Daimler never warned Mr. Leslie of the heightened risk of fuel-fed fires in frontal collisions. ......................... 8

     3.     Statement of the Standard of Review .................................... 8

Summary of the Argument ............................................................... 9

Argument & Citations of Authority ..................................................... 9

     1.     A jury could properly find that Daimler negligently failed to warn Mr. Leslie about the heightened risk of a fuel-fed fire. ............. 11

            A.     Daimler negligently failed to warn Mr. Leslie of the danger. ....................................................... 13

B.     Mr. Leslie's commercial driver's license didn't provide him with equal knowledge of the danger. ..................................15

C.     Mr. Leslie didn't admit to having equal knowledge of the danger. ..................................................................................20

D.     TV shows and movies don't establish that the danger was obvious to Mr. Leslie. ...............................................................25

E.     Daimler's Driver's Manual didn't reasonably warn Mr. Leslie. ...........................................................................................27

F.     The Leslies' failure-to-warn claims don't depend on Mr. Leslie's behavior after the crash. .............................................33

2.   A jury could properly find that Daimler's design of its Freightliner truck constituted a reckless disregard for life. ...............35

A.     Daimler knew that its design unreasonably creates a high degree of probability of substantial harm. ...............................37

B.     Daimler's design changes didn't reasonably reduce the danger. ..........................................................................................39

C.     Daimler's compliance with industry practices or federal regulations isn't a basis for summary judgment. .....................42

D.     Daimler was aware of, but rejected, several safer alternative designs. ...................................................................43

E.     *Ivy v. Ford Motor Co.* isn't binding or relevant precedent on the question of reckless disregard. .......................................47

Conclusion ...............................................................................................48

# Table of Citations

**Federal Cases**

*Cosper v. Ford Motor Co.*,
2023 WL 2374246 (N.D. Ga. Feb. 14, 2024)..........................................47, 48

*Ivy v. Ford Motor Co.*,
646 F.3d 769 (11th Cir. 2011) ...............................................................47. 48

*Rappuhn v. Primal Vantage Co.,*
2024 WL 2930448 (11th Cir. June 11, 2024)..............................................46

*Strickland v. Norfolk S. Ry. Co.*,
692 F.3d 1151 (11th Cir. 2012) ................................................................8

*The T.J. Hopper*,
60 F.2d 737 (2d Cir. 1932) ...................................................................42

\* *Watkins v. Ford Motor Co.*,
190 F.3d 1213 (11th Cir. 1999) ..................................... 10, 12, 15, 29, 34, 39

**Georgia Cases**

*Banks v. ICI Ams., Inc.*,
450 S.E.2d 671 (Ga. 1994) ...................................................................42, 44

\* *Camden Oil Co. v. Jackson*,
609 S.E.2d 356 (Ga. Ct. App. 2004) ..........................................11, 15, 23, 33

*Chrysler Corp. v. Batten*,
450 S.E.2d 208 (Ga. 1994) ...............................................................10, 11, 12

\* *Chrysler Grp., LLC v. Walden*,
792 S.E.2d 754 (Ga. Ct. App. 2016) ......................................................39, 41, 43

\* *Ford Motor Co. v. Cosper*,
893 S.E.2d 106 (Ga. 2023) ...................................................................35

*Fouch v. Bicknell Supply Co.*,
 756 S.E.2d 682 (Ga. Ct. App. 2014) ...........................................................24

*Hunter v. Werner Co.*,
 574 S.E.2d 426 (Ga. Ct. App. 2002) ...........................................................12

*J. C. Lewis Motor Co. v. Williams*,
 69 S.E.2d 816 (Ga. Ct. App. 1952)...............................................................11

*Jones v. Bebee*,
 839 S.E.2d 189 (Ga. Ct. App. 2020) ......................................................41, 42

*Ponce de Leon Condos. v. DiGirolamo*,
 232 S.E.2d 62 (Ga. 1977) ............................................................................41

*R & R Insulation Servs., Inc. v. Royal Indem. Co.*,
 705 S.E.2d 223 (Ga. Ct. App. 2010) ..................................................24, 25, 32

*Taylor v. Devereux Found., Inc.*,
 885 S.E.2d 671 (Ga. 2023) ...........................................................................41

*Weller v. Blake*,
 726 S.E.2d 698 (Ga. Ct. App. 2012) ...........................................................36

## Federal Statutes

28 U.S.C. § 1291 .................................................................................................x

28 U.S.C. § 1332 ...............................................................................................ix

## Georgia Statutes

O.C.G.A. § 51-1-11............................................................................... iii, 9, 35

O.C.G.A. § 51-12-5.1................................................................................... 36

# Statement of Jurisdiction

The Court has subject-matter and appellate jurisdiction to decide Appellants-Plaintiffs Anthony Leslie and Tanyeka Leslie's appeal from the district court's order granting summary judgment to Appellee-Defendant Daimler Truck North America LLC—an order holding that no jury could find for the Leslies on their products-liability claims under Georgia law.

The Court has subject-matter jurisdiction because there is diverse citizenship between the Leslies and Daimler and the amount in controversy meets the required amount. *See* 28 U.S.C. § 1332 (a); R-1 (Compl.) ¶ 3; R-8 (Pls.' Not. of Citizenship as to Members of Daimler Trucks N. Am. LLC) at 1-3. Regarding citizenship, the Leslies are residents and citizens of the State of Georgia. *See* R-1 ¶ 1; R-8 at 3. On the other side, Daimler is a limited liability company, and at the time this action was filed, Daimler's sole member was Daimler North America Corporation. *See* R-8 at 1. Daimler North American Corporation was incorporated in the State of Delaware and had its principal place of business in Michigan. *See id.* at 2. Thus, Daimler was a citizen of Delaware and Michigan—each of which is different from the Leslies' state of citizenship, Georgia. *See id.* at 3. Regarding the amount in controversy, at the time this action was filed, Mr. Leslie's medical expenses alone exceeded $7,000,000.00, which is far more than $75,000.00. *See id.*

The Court has appellate jurisdiction because the district court's order grant-

ing summary judgment in favor of Daimler is a final judgment resolving all claims by all parties. *See* 28 U.S.C. § 1291; R-338 (Judgment). The district court entered its final judgment on March 25, 2024, and the Leslies filed their notice of appeal from that judgment on April 22, 2024—several days before the thirty-day deadline for appeal. *See* R-379 (Pls.' Not. of Appeal); Fed. R. App. P. 4 (a)(1)(A).

In sum, the Court has both subject-matter and appellate jurisdiction.

## Statement of the Issues

This appeal presents the following two issues:

(1)     Could a jury properly find that Daimler negligently failed to warn Mr. Leslie that the design of its 2005 Freightliner truck created a heightened risk of a fuel-fed fire in foreseeable and common frontal collisions?

(2)     Could a jury properly find that Daimler's design of its Freightliner truck constituted a reckless disregard for life?

The answer to each question is yes. And because a jury could properly find for the Leslies on their products-liability claims under Georgia law, the Court should reverse the district court's order granting summary judgment to Daimler.

## Statement of the Case

This appeal arises from a products-liability action under Georgia law filed by Appellants-Plaintiffs Anthony Leslie and Tanyeka Leslie (the "Leslies") against Appellee-Defendant Daimler Truck North America LLC ("Daimler"). On January 31, 2017, Mr. Leslie was driving a 2005 Freightliner truck on I-16 eastbound in Bulloch County, Georgia, when he came upon slowed traffic and tried to avoid a collision with another Freightliner truck in front of him but was unable to do so. Because the truck's front axle moved rearward during the collision and breached the fuel tank, Mr. Leslie was engulfed in a fireball while still inside the cabin. Mr. Leslie suffered catastrophic injuries and burns to 90% of his body.

Because of Mr. Leslie's nearly fatal burn injuries, enormous medical expenses, and now life-long trauma, the Leslies assert products-liability claims against Daimler, the manufacturer of the 2005 Freightliner truck that Mr. Leslie was driving. The district court, however, granted summary judgment to Daimler. The issues on appeal involve whether a jury could properly find for the Leslies on their negligent failure-to-warn claims and their reckless-disregard design claims.

## 1. Statement of the District Court Proceedings

On August 10, 2018, the Leslies filed this action against Daimler in the U.S. District Court for the Northern District. *See* R-1 (Compl.).[3] In their Complaint, the Leslies asserted reckless-disregard design claims (Count 1) and negligent failure to warn claims (Count 2). *See id.* ¶¶ 17-37. The Leslies also requested punitive damages (Count 3) and loss of consortium[4] damages (Count 4).

After more than four years of discovery, discovery-related motions, and other pre-trial motions, on March 17, 2023, Daimler filed a motion for summary judgment on all the Leslies' claims. *See* R-267 (Mot.); R-267-1 (Br.); R-267-02 (SUMF); R-267-03 to R-267-27 (Exhibits); R-268 (Not. of Filing); R-268-1 to R-268-11 (Exhibits); R-269 (Not. of Filing Under Seal); R-269-1 to R-269-7 (Exhibits). On May 16, 2023, the Leslies filed their opposition to Daimler's motion for

---

[3] This action was initially assigned to Judge Eleanor Ross and then later reassigned to Judge Billy Ray.

[4] Anthony Leslie and Tanyeka Leslie are lawfully married, and to avoid confusion, we will generally refer to Anthony Leslie as Mr. Leslie.

summary judgment. *See* R-293 (Opp'n); R-293-1 to R-293-27 (Exhibits); R-294 (SUMF Resp.); R-295 (Not. of Filing Under Seal); R-295-1 to R-295-8 (Exhibits). On June 2, 2023, Daimler filed a reply brief in support of summary judgment. *See* R-305 (Reply); R-305-1 to R-305-7 (Exhibits). And on September 27, 2023, Judge Ray held a hearing on Daimler's motion for summary judgment. R-329.

Nearly six months later, on March 25, 2024, the district court granted Daimler's motion for summary judgment. R-337. Based on its summary judgment, the district court found all other pending motions moot, including Daimler's motion to exclude the Leslies' expert witness Russell Dunn, the Leslies' motion to introduce other similar incidents, Daimler's motion to strike the Leslies' motion to introduce other similar incidents, and a joint motion to amend deadlines. *See id.* at 1.

On April 22, 2024, the Leslies filed a timely notice of appeal from the district court's grant of summary judgment. *See* R-379.

## 2. Statement of the Facts

### A. Mr. Leslie was involved in an ordinary frontal collision that ignited a fireball explosion and nearly killed him.

On January 31, 2017, Mr. Leslie was driving a 2005 Freightliner truck on I-16 eastbound in Bulloch County, Georgia, when he came upon slowed traffic and tried to avoid a collision with another Freightliner truck in front of him but was unable to do so. R-293-1 (Crash Report) at 3-8. Because the truck's front axle moved rearward during the collision and breached the fuel tank, Mr. Leslie was engulfed

in a fireball while still inside the cabin. Mr. Leslie suffered catastrophic injuries and burns to 90% of his body. When the Complaint was filed, Mr. Leslie's medical expenses alone had already exceeded $7 million. *See* R-1 ¶ 16. Since that time and at present, Mr. Leslie's medical expenses are approaching $15 million.

Based on the velocity of the two trucks at the time of the collision, the impact to Mr. Leslie is more like a sideswipe than a frontal collision (*i.e.*, it had less impact than a typical frontal collision would have). *See* R-293-9 (Kennett Expert Report) at 5. "[T]here is no indication of excessive pre-impact speed on the part of Mr. Leslie." *Id*. In fact, "this particular collision [itself] d[id] not pose a serious risk of impact injury to Mr. Leslie." *Id.* at 7. "Instead, his consequential injuries ... are confined to the burns caused by the fire." *Id.*

Yet, even this relatively low impact collision caused the two U-bolts that couple the front axle to the truck's frame to break and allow the front axle to move rearward. *See* R-293-11 (Herbst Expert Report) at 10-11. Because of the axle being forced rearward, the right front wheel/tire assembly impacted the right fuel tank. *See id.* at 28-34. "The material first ignited was diesel fuel vapor that became available when the right fuel tank was breached." R-293-10 (Dyer Expert Report) at 25. "The propagation of the fire was initiated with a 'fireball event,' which was due to the ignition of a significant quantity of diesel vapor that was emitting ... from the breach of the right fuel tank." *Id.* "By the time the vehicle came to rest,

[Mr. Leslie] had sustained severe burns which resulted in him sustaining burn injuries over 90% of his body." *Id.*

### B. Daimler knew that its design choices created a heightened risk of fuel-fed fire in frontal collisions.

Daimler manufactures Class 8 trucks[5] under the brand name Freightliner and designed the 2005 Freightliner Columbia truck that Mr. Leslie was driving (but didn't own himself) on January 31, 2017. *See* R-99 (A. Leslie Dep.) at 59. Daimler designs the fuel tanks in its Freightliner truck to sit behind the front axle and outside of the frame rails. *See* R-293-4 (Daimler 30(b)(6) Dep.) at 47-48.

Daimler has known for decades that this design choice creates a danger and hazard of fires and explosions in foreseeable collisions, including offset frontal collisions like the one Mr. Leslie experienced, which are the most common collisions. *See, e.g.*, R-293-3 (Daimler 30(b)(6) Dep.) at 4-5, 12-13, 24-26.

As early as 1981, Daimler (formerly known as Freightliner) had already prepared an internal memo looking at alternative designs that would reduce this risk of fuel tank breach. *See* R-295-3 at 2-13; R-293-11 at 17. But Daimler took no real action to follow up on any of these designs or otherwise reduce the danger. *Id.*

In 1989, the National Highway Traffic Safety Administration ("NHTSA") released a report entitled "Heavy Truck Fuel System Safety Study," or the "Mary-

---

[5] *See* Wikipedia, https://en.wikipedia.org/wiki/Truck_classification (the heaviest of trucks in the United States, weighing 33,001 lbs. to 80,000 lbs.).

land Study." *See* R-293-2. The Maryland Study found that "[f]ront axle dislocation occurs in many truck accidents involving fuel tank breaches." *Id.* at 118. Following this report, Daimler made minor revisions to the fuel system, but it kept the overall design of the fuel tanks and the front axle largely unchanged. *See* R-293-3 at 7.

Over the next fifteen years, Daimler's understanding and knowledge of the dangers posed by its fuel system design continued to grow. Between 1995 and 1997, Daimler performed four crash tests—which were intended to test the airbag system—in which in all four tests showed rearward movement of the tractor into the fuel system and at least two breaches of the fuel tank. *See* R-293-11 at 17-24.

By the time of Mr. Leslie's collision, Daimler was aware of at least **72 prior incidents** in which its Class 8 trucks with the same or similar fuel tank design as Daimler's 2005 Freightliner truck experienced substantially similar post-collision fuel-fed fires. *See* R-295-8 (Herbst Mar. 17, 2023 Aff.) ¶ 18; *id.* at 9-24.

And Daimler became aware of those 72 prior incidents, even though it "do[es] not keep track of customer complaints with regard to claims of fuel fed fire," R-293-4 at 6, and "doesn't keep any database of field reports with regard to fuel system failures," *id.* at 23; *see also* R-293-19 (Dunn Suppl. Expert Report) at 4. As such, it is safe to infer that there are even more similar incidents out there.

**C.**      **Daimler was aware of, but rejected, several safer alternative designs of the fuel system.**

Despite its knowledge, Daimler didn't conduct a Failure Modes and Effects Analysis ("FMEA") or any similar analysis to reduce the risk of post-collision fuel-fed fires. *See* R-293-4 at 32-33 ("[I]n all of your work that you've done ... testifying on behalf of Daimler ... as its corporate representative, you have never personally seen a [FMEA] on – on any truck or any tractor for the fuel system. Correct? A. I don't believe I have."); *id.* at 44 ("[A]re you aware of any document that shows any sort of system safety analysis or hazard analysis ... ? A. No."); *see also* R-293-19 at 4 ("[N]o FMEA for the subject fuel system has been produced ....").

Had it conducted a FMEA or other similar analysis, Daimler would've redesigned the fuel system for its 2005 Freightliner truck. Daimler was aware of several safer alternative designs including (1) relocating the fuel tanks to inside the frame rails, behind the cabin, or other locations where they would be less prone to breach, *see* R-293-11 at 46-48; (2) installing a Front Underrun Protection System ("FUPS"), which would provide significant reduction in rearward movement of the front axle in frontal collisions, *see id.* at 34-44; (3) adding tethers to secure the front axle, which would limit axle displacement and absorb energy during a crash to prevent breach of the fuel tank, *see id.* at 44-45; and (4) installing fuel tank guards, which in combination with a FUPS would reduce the probability of fuel tank breach, *see id.* at 49-52; R-293-20 (Herbst Suppl. Expert Report) at 7-10.

Thus, "[a]t the time of design and manufacture of the 2005 Freightliner Co-

lumbia, improved designs were readily and inexpensively available that would have resulted in a non-defective vehicle." *Id.* at 11. And "had these alternative designs been utilized the right side fuel tank [of the Freightliner truck Mr. Leslie was driving] would most probably have not ruptured during the subject accident." *Id.*

**D.    Daimler never warned Mr. Leslie of the heightened risk of fuel-fed fires in frontal collisions.**

Not only did Daimler reject several safer alternative designs of the fuel system for its 2005 Freightliner, but it also never warned Mr. Leslie or other drivers of the danger. As Daimler admits, it doesn't "anywhere warn its [drivers] that in a foreseeable frontal collision the axle could move rearward and could compromise the fuel tank and could lead to a fire or explosion." R-293-4 at 39-40. Daimler "do[es] not warn our customers about what could happen if you crash your truck," "[i]n a frontal collision which is the ... most common type of collision." *Id.* at 41.

**3.    Statement of the Standard of Review**

This Court reviews "[the] district court's grant of summary judgment *de novo*, viewing all evidence and drawing all reasonable factual inferences" in favor of the Leslies, as the non-movants, and against Daimler, as the movant. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [the judge] is ruling on a motion for summary judgment or for a directed verdict.'" *Id.*

## Summary of the Argument

The district court erred when it granted summary judgment in Daimler's favor and held that no jury could find in favor of the Leslies. *First*, a jury could properly find that Daimler negligently failed to warn Mr. Leslie that the design of its 2005 Freightliner truck created a heightened risk of a fuel-fed fire in foreseeable and common frontal collisions. *Second*, a jury could properly find that Daimler's design of its 2005 Freightliner truck constituted a reckless disregard for life.

## Argument & Citations of Authority

Under Georgia law, there is a ten-year statute of repose for products-liability actions. "No action shall be commenced pursuant to this subsection [*i.e.*, the subsection on products liability] with respect to an injury after ten years from the date of the first sale for use or consumption of the personal property causing or otherwise bringing about the injury." O.C.G.A. § 51-1-11 (b)(2).

There are, however, exceptions to this statute of repose. One exception is for reckless-disregard design claims. "[T]he limitation [*i.e.*, the statute of repose] ... shall also apply to the commencement of an action claiming negligence of a manufacturer as the basis of liability, except an action seeking to recover from a manufacturer for injuries or damages ... arising out of conduct which manifests a willful, reckless, or wanton disregard for life or property." O.C.G.A. § 51-1-11 (c).

Another exception is for negligent failure-to-warn claims. "Nothing con-

tained in this subsection [*i.e.*, the subsection applying the statute of repose to negligence claims] shall relieve a manufacturer from the duty to warn of a danger arising from use of a product once that danger becomes known to the manufacturer." *Id.* "That '[n]othing' relieves a manufacturer from the duty to warn reflects the legislature's recognition of the possibility that this duty may not emerge until long after the statute of repose has extinguished any cause of action arising out of the product's sale[.]" *Chrysler Corp. v. Batten*, 450 S.E.2d 208, 213 (Ga. 1994).

Here, Mr. Leslie was driving a 2005 Freightliner and his injuries occurred in 2017, which means that his injuries occurred more than ten years after the first sale of the 2005 Freightliner. *See, e.g.*, R-294 (Pl.'s Resp to Daimler's Statement of Material Facts) at 3. Thus, the ten-year statute of repose would bar the Leslies' claims unless one or more of the exceptions apply here.

The Leslies contend and a jury could properly find that both the exception for negligent failure-to-warn claims and the exception for reckless-disregard design claims apply here. To be clear, though, they are "separate and distinct claims." *Batten*, 450 S.E.2d at 211. In other words, the Court can also reverse in part and affirm in part. For example, "it is possible to have a situation where the plaintiff is barred from bringing a design defect claim and yet is allowed to proceed with a failure to warn claim based upon the dangers arising from the same alleged design defect." *Watkins v. Ford Motor Co.*, 190 F.3d 1213, 1219 (11th Cir. 1999) (citing *Batten*).

In any event, once the Court reverses the district court's summary judgment to Daimler on either the Leslies' negligent failure-to-warn claims or their reckless-disregard design claims, that reversal also necessarily vacates the district court's summary judgment to Daimler on the Leslies' loss-of-consortium damages and punitive damages. The district court's holding that the Leslies' "derivative claims for loss of consortium and punitive damages must fail" is based solely on its grant of "summary judgment to Daimler on both of [the Leslies'] substantive claims for [reckless disregard] and failure to warn." R-337 at 29.

With this general framework established, we'll now discuss the Leslies' two claims separately and why the district court erred as to each.

1. **A jury could properly find that Daimler negligently failed to warn Mr. Leslie about the heightened risk of a fuel-fed fire.**

A manufacturer owes "the duty to warn of foreseeable dangers" that "requires the exercise of reasonable care to inform third persons of the dangerous condition or the facts which make the product likely to become dangerous." *Camden Oil Co. v. Jackson*, 609 S.E.2d 356, 358 (Ga. Ct. App. 2004); *see, e.g.*, Restatement 2d of Torts § 388 (describing the rule for negligent failure-to-warn liability); *J. C. Lewis Motor Co. v. Williams*, 69 S.E.2d 816, 819-20 (Ga. Ct. App. 1952) (holding that this rule "is recognized as the law in this State").

"[T]he duty to warn arises whenever the manufacturer knows or reasonably should know of the danger arising from the use of its product." *Batten*, 450 S.E.2d

at 211. "An actual or constructive knowledge requirement is consonant with Georgia tort law in general and is in accord with the position taken by foreign jurisdictions and legal treatises." *Id.* (cites omitted). "This duty to warn is a continuing one and may arise 'months, years, or even decades after the date of the first sale of the product.'" *Watkins*, 190 F.3d at 1218.

This duty exists because "[t]he manufacturer is in the best position to either discover or learn of dangerous product defects." *Hunter v. Werner Co.*, 574 S.E.2d 426, 431 (Ga. Ct. App. 2002). It "has superior knowledge of such defects and the ability to find them, because notice of the defects comes to the manufacturer through product testing, quality control, product complaints, product liability suits, warranty suits, government-imposed recalls, and industry experience." *Id.*

Moreover, "a duty to warn can arise even if a product is not [otherwise] defective." *Id.* "Where ... [the manufacturer] has reason to anticipate that danger may result from a particular use, [it] may be required to give adequate warning of the danger, and the product sold without such warning is in a defective condition." *Id.*

Ultimately, "'[w]hether a duty to warn exists thus depends upon foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger. Such matters generally are not susceptible to summary adjudication and should [ordinarily] be resolved by a trial.'" *Id.*

Here, a jury could properly find that Daimler negligently failed to warn Mr.

Leslie that the design of its 2005 Freightliner truck created a heightened risk of a fuel-fed fire in foreseeable and common frontal collisions.

## A. Daimler negligently failed to warn Mr. Leslie of the danger.

The evidence from which a jury could find that Daimler negligently failed to warn Mr. Leslie of the danger is clear and straightforward.

As Daimler's 30 (b)(6) representative Anthony Moore admitted, "[a] frontal collision is the most common type of collision" and "[i]t's the most foreseeable type of collision to a manufacturer like Daimler." R-293-4 (Daimler 30(b)(6) Dep.) at 35; *see id.* at 35-36 ("A. It's the most foreseeable because it's the most common, yes, and we have statistics that tell us that.").

Moore further admitted that Daimler knows that "during a frontal collision the front axle can move rearward into the fuel tank and compromise the fuel tank," *id.* at 36; *see id.* ("That has happened where the fuel tank has moved rearward – or that the front axle has move rearward and contacted a fuel tank."); *id.* at 10 ("In those four tests you provided, how many of them compromised the fuel tank? A. Two.")—which is exactly what happened during Mr. Leslie's collision, *see* R-293-11 (Herbst Expert Report) at 10 ("[T]he front axle displaced rearward of its normal attached position. ... [T]he passenger's side front wheel has been driven rearward most of the way through the area that was occupied by the fuel tank.").

Moore also admitted that rearward movement of the front axle into the fuel

tank creates a risk of fire, *see* R-293-4 at 37 ("If the front axle moves back into the fuel tank and makes contact with the fuel tank, there may be damage to the fuel tank that may or may not cause a leak."); *Id.* ("If vaporized fuel comes in contact with a sufficient ignition source with a high enough energy, there can be combustion.")—which again is what happened during Mr. Leslie's collision, *see* R-293-10 (Dyer Expert Report) at 25 ("The material first ignited was diesel fuel vapor ....").

In fact, before Mr. Leslie's collision, Daimler was aware of at least **72 prior incidents** in which its Class 8 trucks with the same or similar fuel tank design as Daimler's 2005 Freightliner truck experienced substantially similar post-collision fuel-fed fires. "Each incident involves an allegation of a fuel tank being compromised, and an allegation of fuel release from the compromised fuel tank," and "[t]he majority of these incidents include catastrophic injuries and/or death that was caused by, or enhanced by, a fuel fed fire." R-295-8 (Herbst Mar. 17, 2023 Aff.) ¶ 18; *see also* R-295-8 at 9-24 (chart of other similar incidents).

And Moore expressly admitted that Daimler doesn't, in any way, warn drivers of the danger of fire or explosion from foreseeable frontal collisions:

> Q. Does Daimler Trucks North America anywhere warn its occupants that in a foreseeable frontal collision the axle could move rearward and could compromise the fuel tank and could lead to a fire or explosion?
> MR. MILLER: Object to the form.
> THE WITNESS: No.
>
> ....

Q. I'm asking about that one [*i.e.*, frontal collisions]. They don't warn of that. Right?
A. Correct, we do not warn our customers about what could happen if you crash your truck.

Q. In a frontal collision which is the most type – most common type of collision?
A. Correct.

R-293-4 at 39-41.

In sum, Daimler knows that frontal collisions like Mr. Leslie's collision are the most common and most foreseeable; during such collisions, the front axle can move rearward and breach the fuel tank and, in fact, Daimler's own testing confirms that happens; when the fuel tank is breached, there is a risk of fire and explosion—such a risk that there have been 72 prior similar incidents, the vast majority of which involve serious injury or death; and Daimler doesn't, in any way, warn drivers of the danger of fire or explosion from foreseeable frontal collisions.

Given this evidence, a jury could find that Daimler negligently failed to warn Mr. Leslie of the danger, and Daimler wasn't entitled to summary judgment. *See, e.g.*, *Watkins*, 190 F.3d at 1219; *Camden Oil*, 609 S.E.2d at 358.

### B. Mr. Leslie's commercial driver's license didn't provide him with equal knowledge of the danger.

To find in Daimler's favor, the district court improperly decided many fact disputes, starting with Mr. Leslie's knowledge.

The district court found that "Mr. Leslie is a sophisticated user of heavy

trucks. His CDL [commercial driver's license] training included instruction on the risk of a fire in an accident." R-337 at 26. According to the district court, "[a]s Mr. Leslie was a sophisticated user of heavy trucks expressly trained on the risks involving in operating them, as is required to obtain a CDL license, Daimler had no duty to warn him of the danger of post-collision fuel-fed fires." *Id.* at 27.

But Mr. Leslie testified that his CDL training did *not* include instruction on any risk of post-collision fuel-fed fires:

> Q. And you know from your CDL training that one of the problems with a crash is that you could have some sort of release of fuel from the vehicle?
> A. **<u>No</u>**.
>
> ....
>
> Q. And that would have been something that would have been -- you would have learned during your CDL training, is that there is a risk of fire if you have the release of fuel in an accident; would that be fair?
> A. **<u>I don't recall that from my training</u>**.

R-99 at 49, 51 (emphasis added in both).

Thus, Mr. Leslie's testimony directly contradicts the district court's finding that "[h]is CDL training included instruction on the risk of a fire in an accident" and that he was "expressly trained on the risks." R-337 at 26-27. Rather than ignore Mr. Leslie's testimony, the district court should've accepted it and allowed a jury to decide what weight to give that testimony, how to resolve any conflicts, *etc.*

The district court also found that "Mr. Leslie had been a professional truck

driver with a [CDL] since 2008," he "had to pass an examination on the CDL Manual to obtain his license," and "the CDL Manual expressly instructs on the risk of fire from spilled fuel in an accident." R-337 at 23 (citing R-99 (A. Leslie Dep.) at 23-24; R-99 at 359 (Excerpt of June 2007 Ga. CDL Manual)).

However, Mr. Leslie testified that he was never given the CDL Manual, never got the CDL Manual, and doesn't recall ever reading the CDL Manual:

> Q. I had asked you some questions about your CDL test. Do you re-call getting a CDL manual to study when you were going to school to get your CDL license?
> A. **They don't give you a manual**. They just talked to you in class. It was not like taking a car driving test, you read a book. It's not the same.
>
> Q. Do you recall ever looking through a CDL manual?
> A. During school, **no**.
>
> Q. How about after school?
> A. **No**.

R-99 at 91 (emphasis added).

Similarly, there's no evidence that the CDL exam Mr. Leslie took once in 2008 (and didn't take again) had any questions about the risk of post-collision fuel-fed fires. *See id.* at 23-24 (no discussion of the exam questions); *id.* at 91 ("Q. Do you ever have to take the test again to renew your license? A. No.").

Perhaps the district court's implicit fact finding was that, in 2008, Mr. Leslie should've himself gotten the CDL Manual, should've read the 136-page document, and should've specifically read on page 2-37 the following subsection:

***2.21.1 – Causes of Fire***
The following are some causes of vehicle fires:
After Accidents. Spilled fuel, improper use of flares.
Tires. Under-inflated tires and duals that touch.
Electrical System. Short circuits due to damaged insulation, loose connections.
Fuel. Driver smoking, improper fueling, loose fuel connections.
Cargo. Flammable cargo, improperly sealed or loaded cargo, poor ventilation.

R-99 at 359 (Excerpt of June 2007 Ga. CDL Manual).[6]

Yet, only a jury can decide what Mr. Leslie's knowledge *should* have been. A jury could find that Mr. Leslie reasonably relied on the CDL school he attended for "three weeks," *id.* at 22, and that, if the CDL school didn't see the need to give him a copy of the CDL Manual, then he didn't need to obtain the manual on his own, *id.* at 91. The same is true for his additional "three weeks on the road" training. *Id.* at 23. No one gave him the CDL Manual then either. As Mr. Leslie testified, "[i]t was not like taking [the regular] car driving [exam]," where "you read a book" before taking the exam. *Id.* at 91. "It's not the same." *Id.*

Moreover, a jury could find that, even if Mr. Leslie had been given the CDL Manual, it doesn't reasonably communicate any danger. Kenya Oduor, Ph.D., one of the Leslies' expert witnesses, explains that "[t]he consistent layout and use of fronts and colors on this page [*i.e.*, R-99 at 359], make this information less con-

---

[6] A full copy of the June 2007 Georgia CDL Manual is available here: https://dlg.galileo.usg.edu/data/dlg/ggpd/pdfs/dlg_ggpd_y-ga-bd700-b-ps1-bc6-b2007-belec-p-btext.pdf.

spicuous." R-293-13 (Oduor Expert Report) at 9. "The impact of the message about the causes of fires is minimized because it fails to use a layout and warning format that conveys urgency and what actions or steps to employ." *Id.*

Of course, even if the district court could somehow properly find that Mr. Leslie had full knowledge of everything in the CDL Manual, a jury could still find that Mr. Leslie lacked equal knowledge of the danger. The CDL Manual says merely that there are "some causes of vehicle fires," and one of five causes is "After Accidents. Spilled fuel, improper use of flares." R-99 at 359.

But a jury could find that the danger isn't the mere possibility of "[s]pilled fuel." *Id.* Instead, the jury could find that the danger is Daimler's design of its Freightliner truck—*i.e.*, placing fuel tanks, without effective protection, on the outside of the frame rails and behind the front axle—means that "in a foreseeable frontal collision the axle could move rearward and could compromise the fuel tank and could lead to a fire or explosion." R-293-13 (Oduor Expert Report) at 6.

The CDL Manual provides no warning of that danger. It doesn't warn that "[a] frontal collision is the most common type of collision" and "[i]t's the most foreseeable type of collision." R-293-4 at 35. It also doesn't warn that, "during a frontal collision the front axle can move rearward into the fuel tank and compromise the fuel tank." *Id.* at 36. Indeed, the reference to *spilled* fuel says nothing about a breach of the fuel tank and the *vapor* emissions. *See, e.g.*, R-293-10 at 25

("The material first ignited was diesel fuel vapor ....").

In other words, a jury could find that the CDL Manual says only that "[s]pilled fuel" *can* lead to a fire after a collision. R-99 at 359. But it never warns drivers that Daimler's design of its Freightliner makes a fuel-fed fire a *common* and *foreseeable* risk or that *vapor* emissions could start a fuel-fed fire. And why would the CDL Manual provide such a warning? It was never meant to inform truck drivers of the risks of a manufacturer's design choices. The Georgia Department of Driver Services doesn't know about or control such design choices.

### C.    Mr. Leslie didn't admit to having equal knowledge of the danger.

The district court found that "Mr. Leslie admits to knowing that there is a risk of fire if fuel ignites and that fuel could leak because of a crash." R-337 at 23 (citing R-99 (A. Leslie Dep.) at 28; R-267-21 (A. Leslie RFA Resps.) ¶¶ 30-32).

But the evidence cited by the district court only confirms that Mr. Leslie did *not* admit to having equal knowledge of the danger and that, in violation of the summary-judgment standard, the district court construed the evidence, drew inferences, and resolved disputed facts against the Leslies.

The district court first cites to Mr. Leslie's deposition, in which all that Mr. Leslie admits is that fuel is flammable, and so you shouldn't *smoke* or *overfill* the tank while fueling because the fuel could ignite and cause a fire:

Q. Would you normally fuel those trucks yourself?
A. Yes.

Q. And tell me about the fueling process. What sort of safety rules exist with fueling trucks like this?
A. Safety rules, other than wearing gloves and **not to overfill by the fuel line**, the fuel line in the tank. That's the only safety...

Q. Do the trucks use diesel fuel?
A. Yes.

Q. Are the diesel pumps like the gas pumps, that **you're not supposed to be smoking** or have any open flames around the fueling process?
A. **Yes**.

Q. That's because **the fuel is flammable**. Right?
A. **Correct**.

Q. And there's a risk if you have fuel that you could have a fire or an explosion if something ignited?
A. Correct.

R-99 at 27-28 (emphasis added).

Yet, Mr. Leslie's knowledge that "fuel is flammable" doesn't establish his equal knowledge of the danger. A jury could find that the danger isn't merely that "fuel is flammable." Instead, the jury could find that the danger is that Daimler's design of its Freightliner truck means that in a frontal collision—the most common and most foreseeable type of collision—there's a material risk that the front axle will move rearward, breach the fuel tank, and cause a fire and explosion. *See, e.g.*, R-293-13 (Oduor Expert Report) at 6; R-293-4 (Daimler 30(b)(6) Dep.) at 35-36.

In other words, a jury could find that, although Mr. Leslie knew that fuel is flammable, he didn't know that common and foreseeable *frontal collisions* could

cause the fuel to ignite and result in an explosion. It's one thing to know that fuel is flammable and, thus, you shouldn't smoke or overfill the tank while fueling. That's all Mr. Leslie said he knew. It's quite another thing to know that even an ordinary frontal collision—the kind of thing people call "accidents"— creates a similar risk of fire and explosion. As Mr. Leslie testified, "I wouldn't know if a truck leaked fuel. **It shouldn't leak fuel**." R-99 at 51-52 (emphasis added).

The district court also cites to Mr. Leslie's responses to Daimler's second requests for admission, in which he admits that he was aware of the mere possibility that post-collision fires can occur. *See also* R-337 (MSJ Order) at 24 ("Mr. Leslie had seen vehicles that were involved in post-crash fires.").

But Mr. Leslie expressly said that he didn't know how those fires had occurred and, specifically, he didn't know that common and foreseeable frontal collisions are why post-collision fires often occur with Daimler's Freightliner truck:

> Admit that you were aware before the date of the subject accident that, in certain motor vehicle accidents, vehicles can and do catch fire as a result of the accident.
>
> **RESPONSE: Plaintiff can neither admit nor deny this Request as written, as it does not specify what is meant by "certain motor vehicle accidents." If the Request is asking whether in a general and vague sense Plaintiff is aware that in the past a vehicle has caught fire as a result of an accident, then that would be admitted. However, Plaintiff is unaware of why those vehicles caught fire and whether it was because of a dangerous and defective design. Plaintiff did not have the expectation that his tractor would so easily combust in a foreseeable frontal collision that was a relatively minor side swipe type accident.**

R-267-21 (A. Leslie RFA Resps.) ¶ 29; *see also id.* ¶¶ 30-31 (similar).

Thus, like it did with Mr. Leslie's deposition testimony, the district court improperly decided fact questions when it construed Mr. Leslie's RFA responses to mean his knowledge of the mere possibility that a post-collision fire can occur means he also knew that common and foreseeable frontal collisions are the main reason why such fires occur with Daimler's Freightliner truck.

And Georgia law doesn't allow generalized knowledge that "fuel is flammable" or that it's merely possible for post-collision fires to occur to establish equal knowledge of the danger. If that were the rule, there could never be failure-to-warn claims involving fuel-fed fires. After all, who doesn't know that "fuel is flammable"? Yet, Georgia courts recognize failure-to-warn cases involving fuel-fed fires based on the failure to warn of the *specific* cause of the danger.

For example, in *Camden Oil Co. v. Jackson*, Jackson knew that fuel is flammable and he "was aware of warnings posted at gas stations as to no smoking and turning off engines." 609 S.E.2d at 361. Jackson even knew that, "[d]uring the process of filling a [portable] container, 'a little bit' of gasoline splashed onto Jackson's arm." *Id.* at 358. Still, the Georgia Court of Appeals recognized that a jury could find in Jackson's favor on his claim that Camden Oil negligently failed to warn him of the danger of "explosion or fire from static electricity." *Id.*

In other words, Jackson's knowledge of some ways in which a fuel-fed fire

could occur (*e.g.*, smoking) didn't establish his knowledge of *all* the ways in which it could occur (*e.g.*, static electricity). *See, e.g., Fouch v. Bicknell Supply Co.*, 756 S.E.2d 682, 690 (Ga. Ct. App. 2014) ("Fouch admits that he knew of the general risks associated with sandblasting and that he was required to wear respiratory protection. A factual issue remains, however, regarding whether Fouch was aware of the **specific risks** of using Defendants' products."); *R & R Insulation Servs., Inc. v. Royal Indem. Co.*, 705 S.E.2d 223, 234 (Ga. Ct. App. 2010) ("Thus, while generally speaking one might understand that a plastic material will melt or burn when exposed to an open flame, it does not necessarily follow that one would understand this **particular product** would burn in the manner and speed alleged by Wayne Farms.") (emphasis added in both).

The same is true here. A jury could find that Mr. Leslie's knowledge of some ways in which a fuel-fed fire could occur (*e.g.*, smoking) doesn't establish his knowledge of *all* the ways in which it could occur (*e.g.*, frontal collisions). It certainly doesn't establish his knowledge that "the most common" and "most foreseeable" type of collision—a frontal collision—could start a fire and explosion of Daimler's Freightliner truck. R-293-04 (Daimler 30(b)(6) Dep.) at 35-36.

The district court also found that "Mr. Leslie knew that the tanks containing the flammable diesel fuel were located on the outside frame rails." R-337 at 26.

However, once again, the district court improperly drew factual inferences

against the Leslies. A jury could find that knowing the fuel tanks are outside the frame rails is *not* the same thing as knowing Daimler hasn't done anything (or even has been unable) to protect those tanks from being breached in common and foreseeable frontal collisions. Whether Daimler had, for example, installed bladders or similar internal devices to secure the fuel tank wouldn't be externally visible. And Mr. Leslie wouldn't otherwise know whether Daimler had taken those steps.

In fact, as the Leslies' counsel explained during the summary-judgment hearing, "when you see a design where the fuel tanks are sitting outside of the frame rails, the expectation of the consumer is that the company has done something to make sure that that's safe." R-329 at 65. Mr. Leslie similarly testified that "I wouldn't know if a truck leaked fuel. It shouldn't leak fuel." R-99 at 51-52.

### D. TV shows and movies don't establish that the danger was obvious to Mr. Leslie.

In addition to improperly deciding fact disputes regarding Mr. Leslie's knowledge, the district court also improperly decided fact disputes regarding the alleged "obviousness" of the danger. *See, e.g.*, *R & R Insulation*, 705 S.E.2d at 233 ("Such matters generally are not susceptible of summary adjudication and should be resolved by trial in the ordinary manner.").

The district court found that, "[a]s portrayed in countless T.V. shows and movies, the possibility of a vehicle catching on fire following a crash is common knowledge." R-337 at 25-26. Thus, according to the district court, "[o]bjectively

speaking, the danger of a post-crash fire is open and obvious," and Daimler had no duty to warn of open and obvious dangers. *Id.* at 26.

But what are the TV shows and movies on which the district court relies? And how are those anything like the facts here? There's no answer to these questions because the district court didn't provide any citations, didn't provide any examples, and didn't rely on any record evidence of TV shows or movies.

In any event, there are several problems with the district court's finding.

First, the fictional trope of cars catching on fire and exploding in TV and movies is known to be *wrong*. As one professor explains, "[e]xploding cars may be entertaining to watch in action films. But cars erupting into fireballs when they crash ... is one of the most common and scientifically preposterous movie tropes." Hal Sosabowski, "Debunking Hollywood's Car Explosion Fantasies," May 19, 2023, *see* https://entertainment.howstuffworks.com/hollywood-car-explosion.htm. "Cars never explode under these circumstances and rarely catch fire. That's unless you were unfortunate enough to be driving a Ford Pinto or Chevrolet Malibu in the 1970s," *id.*—or in this case, driving Daimler's Freightliner truck.

Second, Mr. Leslie wasn't driving like Dom, the main character, in the movie The Fast and the Furious. Mr. Leslie's life motto isn't that "I live my life a quarter mile at a time. Nothing else matters: not the mortgage, not the store, not my team, and all their bullshit. For those ten seconds or less, I'm free." The Fast and

the Furious (2001), IMDB, https://www.imdb.com/title/tt0232500/quotes/.

Instead of driving like he was in an action movie, a jury could find that Mr. Leslie's collision was "a moderate overlap frontal collision," R-293-9 (Kennett Expert Report) at 4, which is "the most common type of collision" and "[i]t's the most foreseeable type of collision" for Daimler's Freightliner truck, R-293-4 (Daimler 30(b)(6) Dep.) at 35-36. "[T]here is no indication of excessive pre-impact speed on the part of Mr. Leslie." R-293-9 at 5. In fact, "this particular collision [itself] d[id] not pose a serious risk of impact injury to Mr. Leslie." *Id.* at 7. "Instead, his consequential injuries ... are confined to the burns caused by the fire." *Id.*

Third, and as we've pointed out with several of the district court's fact findings, a jury could find that the danger isn't the mere "possibility of a vehicle catching on fire following a crash." R-337 (MSJ Order) at 26. Instead, the jury could find that the danger is Daimler's design of its Freightliner truck—*i.e.*, placing fuel tanks, without effective protection, on the outside of the frame rails and behind the front axle—means that "in a foreseeable frontal collision the axle could move rearward and could compromise the fuel tank and could lead to a fire or explosion." R-293-13 (Oduor Expert Report) at 6. As such, no TV show or movie could've warned Mr. Leslie of this danger. There's no TV show or movie about the dangers of Daimler's Freightliner truck.

### E. Daimler's Driver's Manual didn't reasonably warn Mr. Leslie.

The district court also made improper fact findings about Daimler's Driver's Manual. The district court found that "Daimler's 'Driver's Manual' contains a warning about the risk of a post-crash fire caused by the rupture of a fuel tank upon impact." R-337 at 24. It further found that "any alleged inadequacy of the warning in the Driver's Manual cannot be the proximate cause of his injuries because Mr. Leslie never read it," *id.* at 28, and "Plaintiffs do not argue that the Driver's Manual was not made available to Mr. Leslie," *Id.* at 28 n.7.

But the evidence contradicts each of the district court's fact findings, and a jury could find that Daimler's Driver's Manual didn't reasonably warn Mr. Leslie.

Regarding the content of the Driver's Manual warning, it says nothing about how foreseeable and common frontal collisions create a risk of "rupture of a fuel tank upon impact," as the district court tries to imply. R-337 at 24. Instead, the Driver's Manual warns about how *overfilling* the tank creates that risk:

> **Never fill fuel tanks to more than 95 percent of their liquid capacity. This could make them more likely to rupture from impact, possibly causing fire and resulting in serious personal injury or death by burning.**

R-268-9 at 368 (excerpt of Daimler's Driver's Manual). It then continues with more fueling warnings like not *mixing* gasoline or alcohol with diesel fuel:

> **Do not mix gasoline or alcohol with diesel fuel. This mixture could cause an explosion, possibly resulting in serious personal injury or death. Do not fill the fuel tanks in the presence or sparks, open flames, or intense heat. These could ignite the fuel, possibly causing severe burns.**

*Id.* In other words, the Driver's Manual only warning is about how certain fueling practices can create a risk of fire, while saying nothing about frontal collisions.

A jury can find that the absence of a warning about frontal collisions renders the warning in the Driver's Manual insufficient and even misleading. As the Leslies' expert witness Dr. Oduor explains, "[a]lthough it mentions that non-compliance, or filling the tank to more than 95 percent, increases the likelihood of fuel tank rupture from impact, there is no mention of impact from a frontal collision." R-293-13 at 7. Additionally, "[t]he wording of this statement could lead to one conclud[ing] that fuel levels below 95% could be perceived as safe in helping to avoid the possibility of fire resulting in serious injury or death"—even though it wouldn't avoid the risks associated with frontal collisions. *Id.* And "the warning's location under the heading pre-trip inspection and daily maintenance implies this relates to routine and frequent tasks"—*i.e.*, fueling tasks, not frontal collisions. *Id.* Thus, based on its inadequate content, a jury could find that Daimler's Driver's Manual didn't reasonably warn Mr. Leslie of the danger.

Of course, even if the content of the Driver's Manual warning were some-how adequate, Daimler still wouldn't be entitled to summary judgment. "Under Georgia law, a manufacturer breaches its duty to warn if it" (1) "fail[s] to provide an adequate warning of the product's potential risks" *or* (2) "fails to 'adequately communicate the warning to the ultimate user.'" *Watkins*, 190 F.3d at 1219. The

first breach focuses "on the content of the warning, inquiring whether the warning is sufficient to apprize the user of the dangers associated with the use of the product." *Id.* The second breach "centers on issues such as location and presentation." *Id.* And, here, a jury could find that, even if the content were adequate, Daimler didn't effectively communicate its warning to foreseeable drivers like Mr. Leslie.

Regarding the communication of the Driver's Manual warning, the district court's assertion that "Plaintiffs do not argue that the Driver's Manual was not made available to Mr. Leslie," R-337 at 28 n.7, is simply wrong.

That's exactly what the Leslies argued below: "[Daimler] is aware that the Subject Tractor is commonly driven by drivers who do not actually own the tractor and potentially **do not have access** to an operator's manual, but [Daimler] does not place any warnings on the Subject Tractor itself." R-293 (Leslies' MSJ Br.) at 2 (emphasis added). "Mr. Leslie was a driver, like many others, who did not own the Subject Tractor, **had no access** to the owner's manual, and had no warning of this foreseeable hazard—but [Daimler] did." *Id.* at 2-3 (emphasis added).

And Mr. Leslie's testimony confirms that he never saw Daimler's Driver's Manual. "[O]ther than providing you with an annual DOT inspection, it sounds like Mr. Dorris [the truck's owner] didn't give you any other documents to look at[.]" R-99 at 69; *see id.* ("Q. Is that correct? A. Correct."); *id.* ("Q. Do you know if there were any other documents in the truck, like a driver's manual, maintenance

manual, anything like that? A. Not from my knowledge, no.").

That's why the Leslies also argued below that "tractors are often driven by drivers who do not own the tractor and the only effective means to communicate to them is via warnings on the tractor itself." R-293 at 21. And Dr. Oduor agreed that "placement of a warning on the product such as [what] we have in our vehicles with regard to air bags," "it's called an on-product warning," would be "an appropriate place to place a warning." R-268-9 (Oduor Dep.) at 171.

True, as the district court notes, Dr. Oduor agreed that the Driver's Manual would also be "an appropriate place to provide such a warning." R-337 at 29 (citing R-268-9 at 171). But that doesn't mean that putting a warning in the Driver's Manual is the *only* place a warning needed to be made. Dr. Oduor never said anything like that. And even if she had, the Leslies wouldn't be limited to what an expert witness said—especially when Dr. Odour was retained to evaluate the *content*, not the communication of, any warning. *See* R-268-09 at 64 ("[W]hat's required in order to make that determination goes beyond what I was asked to do, so that would require some level of requirements gathering from owners and operators and understanding their context and how they utilize the manual.").

Dr. Oduor also didn't agree that putting *this* warning on Daimler's 2005 Freightliner truck itself would be "counterproductive," as the district court tries to imply. R-337 at 29. She merely agreed that, "under most circumstances," "it's very

counterproductive if you have **dozens and dozens** of warnings" as "on-product warning[s]." R-268-09 (emphasis added) at 174-75. The Leslies haven't argued and a jury wouldn't be required to find that Daimler needed "dozens and dozens" of warnings on its 2005 Freightliner Truck.

The jury would only need to find that Daimler should've put this particular warning on its 2005 Freightliner truck. *See, e.g.*, *id.* at 179-80 ("[I]t depends on the severity of a particular scenario and what action you want your operator, in this case your class A vehicle driver, to take to determine which warnings should appear in the cabin of the vehicle versus those that should appear in the manual.").

Thus, the Leslies correctly argued and a jury could find that Daimler needed to put a warning about the fire and explosion risks from common and foreseeable frontal collisions on its 2005 Freightliner truck itself, *i.e.*, an on-product warning like is common for air bags. *See* R-293 at 21; R-268-9 at 171. A jury could find that putting a warning in the Driver's Manual, while helpful and appropriate, wasn't reasonably sufficient given that Daimler knows many drivers don't own the trucks they drive and, thus, likely won't have the Driver's Manual. *See, e.g.*, *R & R Insulation*, 705 S.E.2d at 234 ("[I]t is for the jury to determine whether it provided the appropriate level of warning for those methods.").

And because there are jury questions regarding the adequacy of Daimler's efforts to *communicate* any warning, the district court's finding that "any alleged

inadequacy of the warning in the Driver's Manual cannot be the proximate cause of his injuries because Mr. Leslie never read it" is legal error. R-337 at 28.

"While failure to read instructions or printed warnings will prevent a plaintiff from recovering on a claim grounded on failure to provide adequate warning of the product's potential risk, failure to read a warning does not bar recovery when the plaintiff is challenging the adequacy of the efforts of the manufacturer or seller to communicate the dangers of the product to the buyer or user." *Camden Oil*, 609 S.E.2d at 359. In fact, "where plaintiff alleges that a warning is inadequate because it was not effectively communicated," as the Leslies do here, "the plaintiff's failure to read the warning may be circumstantial evidence of the inadequacy of the warning." *Id.* In other words, the fact that Mr. Leslie never saw the Driver's Manual is itself some evidence that Daimler negligently communicated any warning.

In sum, a jury could find that Daimler's Driver's Manual didn't reasonably warn Mr. Leslie of the danger, both because its content was inadequate *and* because Daimler's attempt to communicate any warning was inadequate.

### F. The Leslies' failure-to-warn claims don't depend on Mr. Leslie's behavior after the crash.

The last set of the district court's improper fact findings involve the effect that any warning would've had in preventing Mr. Leslie's injuries. The district court found that "Mr. Leslie did immediately try to get away from the fuel-fed fire" and the Leslies "cannot say that a warning that was specific to a post-collision fire

scenario would have changed his behavior." R-337 at 24-25.

However, to prevail on their failure-to-warn claims, the jury isn't required to find that Mr. Leslie would've done something different *after* the crash. As this Court has held, "[a]lthough a warning may have the net effect of preventing an accident, that is not what is required by the law." *Watkins*, 190 F.3d at 1219.

Instead, "[t]he law merely requires the warning to inform the consumer of the nature and existence of the hazard, allowing him to make an informed decision whether to take on the risks warned of." *Id.* In other words, and as Dr. Oduor agreed, "if given an appropriate warning," "an individual may deem the hazard more than they want to take on as far as a potential risk and choose not to operate a vehicle" in the first place. R-268-9 at 172. And Mr. Leslie certainly didn't agree to take on the risk of a fuel tank breach caused by a common and foreseeable frontal collision. Again, in his own words, "[i]t shouldn't leak fuel." R-99 at 51-52.

Thus, a jury could find that, had Daimler reasonably warned Mr. Leslie of the danger, he wouldn't have taken on the risk in the first place and, thus, he wouldn't have been injured. A jury wouldn't be limited to *post*-crash behavior;[7] it

---

[7] Dr. Oduor did opine that Daimler's Driver's Manual fails to contain post-crash instructions like "exiting the vehicle immediately and ensuring you keep a safe distance." R-293-13 at 7. However, the Leslies' counsel expressly told the district court that they weren't relying on that opinion to prove causation. *See* R-329 at 61 ("THE COURT: .... I'm not a professional driver and I know to get away from an automobile that has been involved in a collision. I mean, babies know to get away from -- MR. LOWRY: That's not what we're claiming, Your Honor.

could find that Mr. Leslie's *pre*-crash behavior would've been different.

## 2. A jury could properly find that Daimler's design of its Freightliner truck constituted a reckless disregard for life.

In addition to the negligent failure-to-warn exception, there's a separate exception to Georgia's statute of repose for reckless-disregard design claims. The statute of repose doesn't apply to design-defect claims "seeking to recover from a manufacturer for injuries or damages ... arising out of conduct which manifests a willful, reckless, or wanton disregard for life or property." O.C.G.A. § 51-1-11 (c).

Just last year, the Georgia Supreme Court defined those terms—willful, reckless, or wanton—in response to a certified question from the Northern District of Georgia. *See Ford Motor Co. v. Cosper*, 893 S.E.2d 106, 109 (Ga. 2023). "[T]he three terms ... fall on a spectrum of culpable conduct, with willful conduct being the most culpable and reckless conduct being the least culpable." *Id.* at 116.

"'[W]illful' conduct has been described as involving 'an actual intention to do harm or inflict injury.'" *Id.* "Wanton conduct, by contrast, does not involve an actual intent to harm or inflict injury but is nevertheless described as highly culpable conduct that is 'equivalent in spirt to actual intent' to do harm or inflict injury." *Id.* And it's willful and wanton (but not reckless) conduct that meets the standard for punitive damages in Georgia. *See id.* at 113 (noting that the statute of repose

---

THE COURT: Well, you're claiming that he should have gotten away; right? MR. LOWRY: No. That's what they said. We didn't say that.").

and punitive-damages statute were "enacted at the same time," and "O.C.G.A. § 51-12-5.1 (b) permits punitive damages for 'willful misconduct' and 'wantonness' without expressly mentioning 'reckless' conduct").

Meanwhile, "'reckless' conduct is less culpable than 'willful' and 'wanton' conduct, but like 'willful' and 'wanton' conduct, is both more culpable than 'negligent' conduct and likely to cause harm." *Id.* at 117. Specifically, it means that:

> [T]he actor intentionally does an act or fails to do an act which it is [their] duty to the other to do, knowing or having reason to know of facts which would lead a reasonable person to realize that the actor's conduct not only creates an unreasonable risk of harm to another's life or property but also involves a high degree of probability that substantial harm will result to the other's life or property.

*Id.* at 118-19 (largely adopting Restatement (First) of Torts § 500).

Like with failure-to-warn claims, questions regarding reckless-disregard claims generally should be resolved at trial—not summary judgment. *Cf. Weller v. Blake*, 726 S.E.2d 698, 703 (Ga. Ct. App. 2012) ("'[W]hether the tort was sufficiently aggravating to authorize punitive damages is generally a jury question, and a jury may award punitive damages even where the clear and convincing evidence only creates an inference of the defendant[s'] conscious indifference ....").[8]

Here, a jury could properly find that Daimler's design of its Freightliner truck constituted a reckless disregard for life.

---

[8] Reckless disregard for life is something *less* than what is required for punitive damages in Georgia. Thus, if liability for punitive damages is generally a jury question, then *a fortiori*, so is reckless disregard for life.

### A. Daimler knew that its design unreasonably creates a high degree of probability of substantial harm.

The evidence from which a jury could find that Daimler knew that its design unreasonably creates a high degree of probability of substantial harm is extensive.

As we established with the Leslies' negligent failure-to-warn claims, Daimler knew that frontal collisions like Mr. Leslie's collision are the most common and most foreseeable; during such collisions, the front axle can move rearward and breach the fuel tank and, in fact, Daimler's own testing confirms that happens; and when the fuel tank is breached, there is a risk of fire and explosion—such a high degree of risk that there have been at least 72 prior similar incidents, the vast majority of which involve serious injury or death. *See, e.g.*, R-293-4 (Daimler 30(b)(6) Dep.) at 35-36; R-295-8 (Herbst Mar. 17, 2023 Aff.) ¶ 18; *id.* at 9-24.

Despite knowing that the design of its 2005 Freightliner truck creates a high degree of probability of substantial harm, Daimler consciously failed to take reasonable steps to reduce the probability that drivers like Mr. Leslie will be seriously injured or killed. Among other things, Daimler "do[es] not keep track of customer complaints with regard to claims of fuel fed fire," R-293-4 at 6, and "doesn't keep any database of field reports with regard to fuel system failures," *id.* at 23; *see also* R-293-19 (Dunn Suppl. Expert Report) at 4.

Daimler also hasn't conducted a Failure Modes and Effects Analysis ("FMEA") or any similar analysis to reduce the risk of post-collision fuel-fed fires.

*See* R-293-4 at 32 ("[I]n all of your work that you've done ... testifying on behalf of Daimler ... as its corporate representative, you have never personally seen a [FMEA] on – on any truck or any tractor for the fuel system. Correct? A. I don't believe I have."); *id.* at 44 ("[A]re you aware of any document that shows any sort of system safety analysis or hazard analysis ... ? A. No."); *see also* R-293-19 at 3 ("[N]o FMEA for the subject fuel system has been produced ....").

And Daimler was aware of, but rejected, several safer alternative designs, including (1) relocating the fuel tanks to inside the frame rails, behind the cabin, or other locations where they would be less prone to breach, *see* R-293-11 (Herbst Expert Report) at 46-48; (2) installing a Front Underrun Protection System ("FUPS"), which would provide significant reduction in rearward movement of the front axle in frontal collisions, *see id.* at 34-44; (3) adding tethers to secure the front axle, which would limit axle displacement and absorb energy during a crash to prevent breach of the fuel tank, *see id.* at 44-45; and (4) installing fuel tank guards, which in combination with a FUPS would reduce the probability of fuel tank breach, *see id.* at 49-52; R-293-20 (Herbst Suppl. Expert Report) at 7-10.

In sum, "[t]he susceptibility of the fuel tanks to impact and rupture in fore-seeable crash conditions was well known to [Daimler] for decades," and "[a]t the time of design and manufacture of the 2005 Freightliner Columbia, improved designs were readily and inexpensively available that would have resulted in a non-

defective vehicle." *Id.* at 11. "[H]ad these alternative designs been utilized the right side fuel tank [of the Freightliner truck Mr. Leslie was driving] would most probably have not ruptured during the subject accident." *Id.*

Given this evidence, a jury could find that Daimler's design constituted a reckless disregard for life. *See, e.g.*, *Watkins*, 190 F.3d at 1213; *Chrysler Grp., LLC v. Walden*, 792 S.E.2d 754, 760-61 (Ga. Ct. App. 2016).[9]

**B.    Daimler's design changes didn't reasonably reduce the danger.**

Much like it did with the Leslies' negligent failure-to-warn claims, to find in Daimler's favor on the Leslies' reckless-disregard design claims, the district court improperly decided many fact disputes, starting with Daimler's design changes.

The district court found that, "[a]fter the 1989 Maryland Study, Daimler incorporated many design changes to reduce that risk [*i.e.*, the risk of post-crash fuel-fed fires] and subjected its design to full-scale vehicle crash testing." R-337 at 20.

But a jury could find that none of Daimler's design changes reasonably reduced the danger. For example, the district court relied on the fact that Daimler "enlarged the U-bolts that connect the front axle to the frame for greater clamping force." *Id.* at 9. Yet, there was no "testing of the U-bolts done after that change,"

---

[9] In *Cosper*, the Georgia Supreme Court agreed that *Walden* "indirectly relied on the Restatement (First) of Torts in providing [a] definition of 'reckless' conduct," but disapproved of *Walden's* definition for failing to *fully* incorporate the Restatement definition. 893 S.E.2d at 119 n.7. However, nothing about the partial disapproval of *Walden's* definition suggests that its *holding* is incorrect. *Walden* correctly held that Chrysler wasn't entitled to judgment as a matter of law.

R-267-3 (Daimler 30(b)(6) Dep.) at 15, and there's no other evidence that enlarging the U-bolts (or any other design changes) actually reduced the danger.

In fact, the four crash tests that Daimler performed confirm that the danger remained. In the first test, "the passenger's side fuel tank was punctured by the front axle spring." R-293-11 at 18; *see id.* at 19 ("showing the right front wheel impacting the fuel tank as the front axle is displaced rearward"). In the second test, "one of the fuel tank mounting brackets broke and another bracket cracked." *Id.* In the third test, again, "the front axle was driven rearward and the right front wheel impacted the front of the fuel tank." *Id.* at 21; *see id.* ("The fuel tank was driven rearward in its mounting straps." *Id.* Notably, "the axle twisted about 30 degrees **breaking U-bolts** on both ends of the axle." *Id.* (emphasis added). Thus, "this test shows a significant risk of the fuel system being compromised." *Id.* And in the fourth test, once more, "the front axle was driven rearward and the driver's side wheel impacted the driver's side fuel tank," and there was "a stream of fluid is pouring out of the punctured passenger's side fuel tank." *Id.* at 22.

In short, all four of Daimler's crash tests show "rearward movement of the fuel tank," and in two of them, even Daimler admits there was a "puncture" of the fuel tank. R-293-4 at 10; *see also* R-293-11 at 22. And, in addition to its own crash tests, Daimler also had at least 72 prior similar incidents to confirm that the danger of post-collision fuel-fed fires remained. *See, e.g.*, R-293-4 (Daimler 30(b)(6)

Dep.) at 35-36; R-295-8 (Herbst Mar. 17, 2023 Aff.) ¶ 18; *id.* at 9-24; *Walden*, 792

S.E.2d at 760 (relying on "17 other collisions"—far less than the 72 here).

Thus, a jury could find that Daimler knew that enlarging the U-bolts and other superficial design changes wasn't reducing the danger and that Daimler's failure to adopt reasonable design alternatives constituted reckless disregard.

Indeed, just last year, the Georgia Supreme Court affirmed liability for punitive damages (again, a higher standard), where similar incidents continued to occur despite the defendant's argument that it was taking steps to reduce the danger. *See Taylor v. Devereux Found., Inc.*, 885 S.E.2d 671, 704 (Ga. 2023) ("[A]lthough evidence was presented that Devereux ran a background check on Singleterry[,] ... evidence was also presented that despite Devereux's hiring policies, there were still incidents of Devereux staff members in other states sexually assaulting residents, including three before 2012 and five after 2012, and one incident of a staff member 'grooming' two patients in the Georgia facility in 2017.").

In other words, that a defendant made "some effort" and took some "remedial steps" doesn't mean that they acted with some *care*, if the danger remains. *Id.* (citing *Ponce de Leon Condos. v. DiGirolamo*, 232 S.E.2d 62 (Ga. 1977), as holding that "when the 'appellants made some effort to alleviate' the run-off problem they created, but did not address the source of the problem, '[t]he jury was authorized to find that the appellants had acted with 'conscious indifference'"); *see Jones*

*v. Bebee*, 839 S.E.2d 189, 193 (Ga. Ct. App. 2020) ("[A]fter the two earlier attacks, the Joneses failed to directly and effectively address the dog's aggression issues (even though they did sign the dog up for a few weeks of obedience training).").

### C. Daimler's compliance with industry practices or federal regulations isn't a basis for summary judgment.

In addition to improperly deciding fact disputes regarding Daimler's design changes, the district court also committed legal error in granting summary judgment based on industry practices or federal regulations. In finding that there was no evidence of reckless disregard, the district court relied on the fact that "[t]here is no evidence that other heavy truck manufacturers in the U.S. had any safer or better design in 2005," and "[t]he subject truck met or exceeded all federal safety standards in 2005." R-337 at 20; *see id.* at 21-22.

However, the Georgia Supreme Court had made it clear that "[a] manufacturer's proof of compliance with industry-wide practices, state of the art, or federal regulations does not eliminate conclusively its liability for its design of allegedly defective products." *Banks v. ICI Ams., Inc.*, 450 S.E.2d 671, 674 n.6 (Ga. 1994). Or as Judge Learned Hand explained, "a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages." *The T.J. Hopper*, 60 F.2d 737, 740 (2d Cir. 1932).

For that reason, courts applying Georgia law have rejected arguments by manufacturers that compliance with industry practices or federal regulations enti-

tles them to judgment as a matter of law on reckless disregard. *See, e.g.*, *Walden*, 792 S.E.2d at 761 ("Chrysler argues that it was entitled to a directed verdict on ... reckless or wanton disregard for human life because there were 27 million vehicles being driven on the road with rear-mounted fuel tanks at the time .... This fact, however, was evidence for the jury to consider; it does not mean that the plaintiffs submitted no evidence to support their claim."); *id.* ("[S]imply because Chrysler complied with the federal standard did not entitle it to a directed verdict.").

The same is true here. The fact that placing fuel tanks outside of the frame rails may have complied with industry practices or federal standards doesn't entitle Daimler to summary judgment. It is simply one fact, among other evidence, that a jury must consider and weigh in resolving this fact dispute.

### D. Daimler was aware of, but rejected, several safer alternative designs.

The district court compounded its legal error regarding industry practices and federal regulations by also using them as a basis to reject the Leslies' evidence that Daimler was aware of, but rejected, several safer alternative designs.

The district court held that, "[w]hile Plaintiffs' expert, Mr. Herbst, suggests [safer] design concepts," "no heavy truck sold in the U.S. has ever incorporated the design concepts that [he] suggests – not in 2005 or even today." R-337 at 20.

But, again, "a manufacturer's proof of compliance with industry-wide practices, state of the art, or federal regulations does not eliminate conclusively its lia-

bility for its design of allegedly defective products." *Banks*, 450 S.E.2d at 674 n.6.

As such, the district court wasn't authorized to reject Mr. Herbst's expert opinions

about safer alternative designs simply because they haven't been adopted by other

manufacturers. That is an issue for a jury to decide.

Similarly, a jury—not the district court—decides what weight to give and

whether to accept Mr. Herbst's expert testimony that there were safer alternative

designs available to Daimler at the time it designed its 2005 Freightliner Truck.

For example, the district court discounted Mr. Herbst's expert opinions because

"[h]e admits his ideas are mere design concepts and that a lot more engineering

development and testing is needed before they can be put on a truck." R-337 at 15.

However, Mr. Herbst also explained that, while engineering work would be

needed to execute the safer design alternatives he identifies, there's no reason why

Daimler wouldn't have been able to do that:

> Q. But certainly this design you have here – and we will talk about
> this, I promise this is the last time I'll talk about it -- it's not something
> you can take out of a box and put on a truck. There is a lot of work
> that needs to be done before we -- right?
> A. Yeah. My opinion would be this design would require some more
> engineering work before it got put on the truck, which, again, I think
> is -- I've yet to see –
>
> Q. I apologize.
> A. -- **which I've yet to see is not something that Freightliner is in-
> capable of or that it's not doable**.

R-268-07 (Herbst Dep.) at 117; *see also id.* at 116 ("I would certainly tell the jury

this is something that would need to be engineered and **certainly well within Freightliner's wheelhouse**, and their engineers could certainly do that."); *id.* at 118 ("[I]f they had chose[n] to do so, **Freightliner would be able to develop** a cage that can sustain this and that that is something within – that is reasonable and technologically feasible.") (emphasis added in all).

The district court accepted and put all weight on the first part of Mr. Herbst's answer—that more work would be needed—while rejecting and giving no weight to the second part of Mr. Herbst's answer—that Daimler *would* be able to perform that work. That's improper fact finding by the district court.

Moreover, the district court disregarded the fact that many of Mr. Herbst's safer alternative designs, while not adopted yet by manufacturers for Class 8 trucks in the United States, have been implemented in other contexts sufficient to demonstrate their feasibility for Daimler's Freightliner truck.

For example, "[w]hile some truck manufacturers have argued that it is not feasible to install FUPS on trucks built for the American market, the Australian truck market proves this is not the case." R-293-11 (Herbst Expert Report) at 41. "[A] number of companies specialize in importing [American] trucks and retrofitting them to meet Australian standards, which include the installation of FUPS." *Id.* Similarly, "[a] company that supplies wheel tethers to Formula One racing teams has been contacted and has confirmed that it can produce a front axle tether

... for heavy truck applications." *Id.* at 45. And "[t]he fuel tank guards that were provided on other [Daimler] vehicles, including other Freightliner vehicles, demonstrate Freightliner's ability to design and manufacture fuel tank guards on production vehicles." *Id.* at 53. Again, these are all issues for a jury.

As for the fact that Mr. Herbst admits that *all* "risk cannot be eliminated because there are 'always going to be crash conditions that can exceed the capabilities of the protective structures,'" R-337 at 21 (quoting R-268-6 at 61-62), the district court's reliance on that fact to grant summary judgment is also legal error.

The Leslies don't have to show that *all* risk must be eliminated. Instead, the Leslies need only show that *their* injuries could've been prevented. And that's precisely what Mr. Herbst has opined: "had these alternative designs been utilized the right side fuel tank would most probably have not ruptured during the subject accident." R-293-20 at 11. In fact, this Court recently reversed a district court for reaching the same holding in another case. *See, e.g.*, *Rappuhn v. Primal Vantage Co.*, 2024 WL 2930448, at *5 (11th Cir. June 11, 2024) (unpublished) ("The district court suggested that ... Rappuhn cannot establish [his claim] .... unless the alternative design is resistant to **all** user error. The district court was incorrect. .... One way Rappuhn could meet his burden ... is by establishing that an alternative design ... has a *lower* risk of user error and device failure such that his injury wouldn't have occurred if it had been used.") (emphasis added).

**E.** ***Ivy v. Ford Motor Co.* isn't binding or relevant precedent on the question of reckless disregard.**

Finally, the district court relied heavily, if not exclusively, on *Ivy v. Ford Motor Co.*, 646 F.3d 769 (11th Cir. 2011), in granting summary judgment to Daimler, finding that "[t]he circumstances of the present case are analogous to those in *Ivy*." R-337 at 18-22. But *Ivy* is neither binding nor relevant precedent on the question of reckless disregard by Daimler presented here.

*Ivy* isn't binding precedent on reckless disregard because its holding is limited to willful and wanton conduct. It didn't address *reckless* conduct:

> [T]he mere fact that some expert might develop an after-the-fact opinion that the vehicle is defective is not sufficient to create a genuine issue of material fact as to whether Ford was **willful and wanton** with respect to marketing the vehicle. Although pressed at oral argument, Ivy could cite no case suggesting that an after-the-fact expert opinion under such circumstances could create a jury question as to **wantonness**. As a matter of common sense and common experience with respect to the meaning of **wanton conduct**, merely finding an after-the-fact expert to opine that a product is defective cannot be sufficient to create a jury question on the issue of **wantonness**—defined as willful conduct based on an actual intention to do harm or wanton conduct that is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit of actual intent ....

646 F.3d at 777 (emphasis added).

In fact, one reason why the Northern District of Georgia certified questions in *Cosper* is precisely because "in *Ivy*, the Eleventh Circuit cites the statutory exception ... but only analyzes the claim based on willful and wanton conduct." *Cosper v. Ford Motor Co.*, 2023 WL 2374246, at *4 (N.D. Ga. Feb. 14, 2024). "The

Court does not mention recklessness beyond its inclusion in the statute." *Id.*

The Georgia Supreme Court accepted that certified question and has now held that "'reckless' conduct is a standalone exception." *Cosper*, 317 Ga. at 356. And in this action under Georgia law, this Court is bound to apply binding Georgia Supreme Court precedent and analyze reckless conduct as a standalone exception. This Court isn't bound by *Ivy's* analysis of only willful and wanton conduct.

Of course, even if *Ivy* had analyzed reckless conduct, the facts in *Ivy* are materially different than the facts here. Among other things, unlike in *Ivy*, Mr. Herbst doesn't offer an "after-the-fact opinion." 646 F.3d at 777. Mr. Herbst's opinions are expressly based on what was available "[a]t the time of design and manufacture of the 2005 Freightliner Columbia." R-293-20 at 11. And under *Cosper*, a jury must consider, not just what Daimler knows, but what Daimler has "**reason to know**." 893 S.E.2d at 117 (emphasis added). The jury also must consider "facts which would lead a **reasonable** [person]"—not which would lead Daimler subjectively—to conclude that they have created a high degree of probability of substantial harm. *Id.* (emphasis added); *compare Ivy*, 646 F.3d at 778 (relying on case law that addresses "subjective mental intent"). *Ivy* simply doesn't apply here.

### Conclusion

For those reasons, this Court should reverse the district court's summary judgment in favor of Daimler. Signature and certificate pages follow.

The Leslies submit this brief on July 3, 2024.

**/s/ Naveen Ramachandrappa**

Stephen G. Lowry
Ga. Bar No. 460289
Andrew J. Conn
Ga. Bar No. 732541
HARRIS LOWRY
MANTON LLP
410 E Broughton St
Savannah, GA 31401
Tel: 912-651-9967
*steve@hlmlawfirm.com*
*aconn@hlmlawfirm.com*


Ronnie L. Crosby
PARKER LAW GROUP
101 Mulberry St E
PO Box 487
Hampton, SC 29924
Tel: 803-943-2111
*rcrosby@parkerlawgroupsc.com*

Naveen Ramachandrappa
Ga. Bar No. 422036
Joshua F. Thorpe
Ga. Bar No. 710665
BONDURANT, MIXSON &
ELMORE, LLP
1201 W Peachtree St NW
Ste 3900
Atlanta, GA 30309
Tel: 404-881-4100
*ramachandrappa@bmelaw.com*
*thorpe@bmelaw.com*


Samuel K. Morgan, Jr.
MORGAN LITIGATION
GROUP, LLC
135 E Main St
Lexington, SC 29072
Tel: 803-359-6194
*km@morganlitigation.com*

*Attorneys for Plaintiffs*

**Certificate Of Compliance**

This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B) because this brief contains a total of 12,530/13,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32 (f) and 11th Cir. R. 32-4.

This brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with size 14 Times New Roman font.

This certification is made on July 3, 2024.

**/s/ Naveen Ramachandrappa**

## Certificate Of Service

I certify that, on July 3, 2024, I filed **Appellants-Plaintiffs Anthony Leslie and Tanyeka Leslie's Principal Brief** using the ECF system, which will generate notice and serve this document on the following counsel for Appellee-Defendant:

Stevan A. Miller
Barbara A. Marschalk
DREW, ECKL & FARNHAM, LLP
303 Peachtree St NE, Ste 3500
Atlanta, GA 30308
Tel: 404-885-1400
*millers@deflaw.com*
*marschalkb@deflaw.com*

Richard H. Grafton
GERMER BEAMAN & BROWN, PLLC
301 Congress Ave, Ste 1700
Austin, TX 78701
Tel: 512-472-0288
*rgrafton@germer-austin.com*

Jeffrey E. Tompkins
THOMAS KENNEDY SAMPSON & TOMPKINS, LLP
3355 Main St
Atlanta, GA 30337
Tel: 404-688-4503
*j.tompkins@tkstlaw.com*

Kim M. Watterson
REED SMITH LLP
Reed Smith Centre
225 Fifth Ave
Pittsburg, PA 15222
Tel: 412-288-3131
*kwatterson@reedsmith.com*

**/s/ Naveen Ramachandrappa**