Case No. 24-11372-D

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

ANTHONY LESLIE and TANYEKA LESLIE,
Appellants-Plaintiffs,

v.

DAIMLER TRUCK NORTH AMERICA LLC,
Appellee-Defendant.

---

Appeal from the United States District Court
for the Northern District of Georgia

---

## APPELLEE'S BRIEF

---

Kim M. Watterson
Ted A. Hages
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222-2716

Barbara A. Marschalk
Stevan A. Miller
DREW ECKL & FARNHAM, LLP
303 Peachtree Street NE
Suite 3500
Atlanta, GA 30308

Richard H. Grafton
GERMER BEAMAN & BROWN PLLC
One Barton Skyway
1501 S Mopac Expy, Suite A400
Austin, TX 78746

Jeffrey E. Tompkins
THOMAS KENNEDY SAMPSON &
TOMPKINS LLP
3355 Main Street
Atlanta, Georgia 30337

Attorneys for Appellee-Defendant
*Daimler Truck North America LLC*

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellee-Defendant Daimler Truck North America LLC ("DTNA") hereby makes the following statements pursuant to Federal Rule of Civil Procedure 26.1 and 11th Cir. R. 26.1-1. The following persons have an interest in the outcome of this appeal:

- Adle, Sarah G. [former counsel for Appellants-Plaintiffs]

- Atlantic Trucking Co., Inc. [recipient of non-party discovery requests]

- Bedford, Nicholas D.M. [counsel for non-party Atlantic Trucking Co., Inc.]

- Bondurant, Mixson & Elmore, LLP [law firm for Appellants Plaintiffs]

- Conn, Andrew J. [counsel for Appellants-Plaintiffs]

- Crosby, Ronnie L. [counsel for Appellants-Plaintiffs]

- Daimler Truck AG [indirectly owns and owns more than 10% of the stock for Daimler Truck North America LLC]

- Daimler North America Corporation [incorrectly designated by Plaintiffs-Appellants as the sole member of Daimler Truck North America LLC]

- Daimler Truck & Buses US Holdings, LLC [wholly owns and owns more than 10% of the stock for Daimler Truck North America LLC]

- Daimler Truck North America LLC [Appellee-Defendant]

- Daimler Trucks North America LLC [spelling of Appellee-Defendant in initial district court pleadings and as docketed by this Court]

- Davis, Kristy S. [former counsel for Appellants-Plaintiffs]

- Dennis Corry Smith & Dixon, LLP [law firm for non-party Atlantic Trucking Co., Inc.]

- Dixon, John D. [counsel for non-party Atlantic Trucking Co., Inc.]

- Drew Eckl & Farnham, LLP [law firm for Appellee-Defendant]

- Freightliner LLC [former name of Daimler Truck North America LLC]

- Grafton, Richard H. [counsel for Appellee-Defendant]

- Germer PLLC [law firm for Appellee-Defendant]

- Germer Beaman & Brown, PLLC [law firm for Appellee-Defendant]

- Hages, Ted A. [counsel for Appellee-Defendant]

- Harris, Jeffrey R. [counsel for Appellants-Plaintiffs]

- Harris Lowry Manton LLP [law firm for Appellants-Plaintiffs]

- Harris, Rebecca F. [counsel for Appellants-Plaintiffs]

- Leslie, Anthony [Appellant-Plaintiff]

- Leslie, Tanyeka [Appellant-Plaintiff]

- Leslie, Tanica [initial spelling of Tanyeka Leslie in district court pleadings]

- Lowry, Stephen G. [counsel for Appellants-Plaintiffs]

- Manton, Jed D. [counsel for Appellants-Plaintiffs]

- Marschalk, Barbara A. [counsel for Appellee-Defendant]

- Mead, Spencer P. [former counsel for Appellants-Plaintiffs]

- Miller, Stevan A. [counsel for Appellee-Defendant]

- Morgan Litigation Group, LLC [law firm for Appellants-Plaintiffs]

- Morgan, Samuel K., Jr. [counsel for Appellants-Plaintiffs]

- Parker, John E., Jr. [counsel for Appellants-Plaintiffs]

- Parker Law Group [law firm for Appellants-Plaintiffs]

- Peters, Murdaugh, Parker, Eltzroth & Detrick, P.A. [former law firm for Appellants-Plaintiffs]

- Ramachandrappa, Naveen [counsel for Appellants-Plaintiffs]

- Ray, William M., II, Hon. [district court judge]

- Reed Smith LLP [law firm for Appellee-Defendant]

- Ross, Eleanor L., Hon. [initial district court judge]

- Thomas, Kennedy, Sampson & Tompkins LLP [law firm for

Appellee-Defendant]

- Thorpe, Joshua F. [counsel for Appellants-Plaintiffs]

- Tompkins, Jeffrey E. [counsel for Appellee-Defendant]

- Walker & Morgan, LLC [former law firm for Appellants-Plaintiffs]

- Watterson, Kim M. [counsel for Appellee-Defendant]

## STATEMENT REGARDING ORAL ARGUMENT

The district court's decision granting summary judgment in favor of Daimler Truck North America LLC is well-reasoned and well-grounded in the record and controlling law. Oral argument, therefore, is not required.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ................................... i

PRELIMINARY STATEMENT ......................................................... 1

COUNTERSTATEMENT OF THE ISSUES ........................................ 2

COUNTERSTATEMENT OF THE CASE .......................................... 2

    A.    The Parties ................................................................. 2

    B.    Factual Background ...................................................... 3

        1.    The Collision ...................................................... 3

        2.    The Truck ........................................................... 7

            a.    Design And Testing Of The Truck ......................... 7

            b.    The Truck's Safety Warnings ............................... 10

    C.    Procedural History ....................................................... 11

        1.    The Complaint ..................................................... 11

        2.    The Summary Judgment Decision .............................. 11

SUMMARY OF THE ARGUMENT .................................................. 13

STANDARD OF REVIEW ............................................................ 14

ARGUMENT ........................................................................... 15

I.    The District Court Correctly Entered Summary Judgment On
Plaintiffs' Failure To Warn Claim ............................................... 15

    A.    Georgia Law On Warning Claims ...................................... 15

    B.    Application of Georgia Law To The Uncontroverted Record
Shows That Summary Judgment Was Proper .......................... 18

C.  Plaintiffs' Arguments Do Not Refute What Georgia Law And The Evidence Command.................................................. 30

II.  The District Court Correctly Entered Summary Judgment On Plaintiffs' Negligent Design Claim .............................................. 42

A.  Georgia's Statute Of Repose And Its Willful, Wanton, And Reckless Designing Exception........................................... 42

B.  Uncontroverted Record Evidence Shows DTNA Did Not Recklessly, But Instead Carefully And Conscientiously, Design Its Heavy Truck. ................................................. 45

C.  Plaintiffs' Recklessness Theories Fail As A Matter Of Law And Fact ................................................................... 48

CONCLUSION................................................................ 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................. 15

*Bachtel v. TASER Int'l, Inc.*, 747 F.3d 965 (8th Cir. 2014) ...................... 41

*Banks v. ICI Americas, Inc.*, 450 S.E.2d 671 (Ga. 1994) ............ 44, 50, 51, 54

*Bodymasters Sports Indus. v. Wimberley*, 501 S.E.2d 556
   (Ga. App. 1998) ............................................................. 20

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ............................................... 53, 58

*Broussard v. Cont'l Oil Co.*, 433 So.2d 354 (La. App. 1983) ............... 25, 38

*Bryant v. Hoffmann-La Roche, Inc.*, 585 S.E.2d 723
   (Ga. App. 2003) ............................................................. 51

*Camden Oil Co. v. Jackson*, 609 S.E.2d 356 (Ga. App. 2004) .......... 36, 37, 39

*Cates v. Zeltiq Aesthetics, Inc.*, 73 F.4th 1342 (11th Cir. 2023) ............. 32, 36

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................. 14, 15

*CertainTeed Corp. v. Fletcher*, 794 S.E.2d 641 (Ga. 2016) .................. 16, 36

*Chapman v. AI Transp.*, 229 F.3d 1012 (11th Cir. 2000) ......................... 14

*Christopher v. Donna's Country Store*, 511 S.E.2d 579
   (Ga. App. 1999) ............................................................. 39

*Chrysler Corp. v. Batten*, 450 S.E.2d 208 (Ga. 1994) .................... 16, 42, 44

*Chrysler Grp., LLC v. Walden*, 792 S.E.2d 754 (Ga. App. 2016) ........... 52, 56

*Cobb Heating Co. v. Hertron Chemical Co.*, 229 S.E.2d 681
   (Ga. App. 1976) ........................................................ 24, 28

*Cosper v. Ford Motor Co.*, 2023 U.S. LEXIS 40138
   (N.D. Ga. Feb. 14, 2023) ..................................................... 57

*D'Elia v. Phillips Edison & Co.*, 839 S.E.2d 721 (Ga. App. 2020) .............. 17

*Daniels v. Bucyrus-Erie Corp.*, 516 S.E.2d 848 (Ga. App. 1999) ............... 19

*Davis v. John Crane, Inc.*, 836 S.E.2d 577 (Ga. App. 2019) ..................... 18

*Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812 (11th Cir. 2010) ......... 16, 18

*Dozier Crane & Mach., Inc. v. Gibson*, 644 S.E.2d 333
(Ga. App. 2007) ................................................................ 27

*Exxon Corp. v. Jones*, 433 S.E.2d 350 (Ga. App. 1993) ..................... 19, 44

*Eyster v. Borg-Warner Corp.*, 206 S.E.2d 668 (Ga. App. 1974) ............. 17, 22

*Farmer v. Brannan Auto Parts, Inc.*, 498 S.E.2d 583
(Ga. App. 1998) ........................................................ 17, 23, 28

*Ford Motor Co. v. Cosper*, 893 S.E.2d 106 (Ga. 2023) ......................*passim*

*Fouch v. Bicknell Supply Co.*, 756 S.E.2d 682 (Ga. App. 2014) ............. 36, 37

*Ga. Cas. & Sur. Co. v. Salter's Indus. Serv.*, 734 S.E.2d 415
(Ga. App. 2012) ................................................................ 18

*Gen. Motors Corp. v. Saenz ex rel. Saenz*, 873 S.W.2d 353
(Tex. 1993) ............................................................ 25, 37, 38

*Head v. Sears Roebuck & Co.*, 503 S.E.2d 354 (Ga. App. 1998) ................ 40

*Henry v. Gen. Motors Corp.*, 60 F.3d 1545 (11th Cir. 1995) ..................... 27

*Hernandez v. City of Beaumont*, 742 F. App'x. 257 (9th Cir. 2018)
(unpublished) ................................................................ 41

*Hood v. Ryobi Am. Corp.*, 181 F.3d 608 (4th Cir. 1999) ......................... 36

*Hubbard v. Bayer Healthcare Pharmaceuticals Inc.*, 983 F.3d 1223
(11th Cir. 2020) ........................................................... 18, 20

*Hunt v. Harley-Davidson Motor Co.*, 248 S.E.2d 15
(Ga. App. 1978) ................................................................ 44

*Hunter v. Werner Co.*, 574 S.E.2d 426 (Ga. App. 2002) ......................... 33

*Ivy v. Ford Motor Co.*, 646 F.3d 769 (11th Cir. 2011) ........................*passim*

*Jones v. Bebee*, 839 S.E.2d 189 (Ga. App. 2020)....................................56

*Lamb v. Sears, Roebuck & Co.*, 1 F.3d 1184 (11th Cir. 1993) .......... 17, 20, 32

*Linert v. Foutz*, 75 N.E.3d 1218 (Ohio 2016)........................................54

*Lockart v. Kobe Steel Ltd. Constr. Mach. Div.*, 989 F.2d 864
(5th Cir. 1993)................................................................................25

*Lockman v. S.R. Smith, LLC*, 405 F. App'x 471 (11th Cir. 2010) ...............20

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) .................................15

*Magoffe v. JLG Indus.*, 375 F. App'x. 848 (10th Cir. 2010) .....................26

*McCleskey v. Olin Mathieson Chem. Corp.*, 193 S.E.2d 16
(Ga. App. 1972) ...............................................................................28

*Moore v. ECI Mgmt.*, 542 S.E.2d 115 (Ga. App. 2000) ...........................21

*Nease v. Ford Motor Co.*, 848 F. 3d 219 (4th Cir. 2017) .........................49

*Niles v. Bd. of Regents*, 473 S.E.2d 173 (Ga. App. 1996)........... 21, 28, 29, 42

*Ogletree v. Navistar Intern. Transp. Corp.*, 500 S.E.2d 570
(Ga. 1998) ......................................................................................20

*Omark Industries, Inc. v. Alewine*, 319 S.E.2d 24 (Ga. App. 1984)..............36

*Ponce de Leon Condos v. DiGirolamo*, 232 S.E.2d 62 (Ga. 1977)...............56

*Powell v. Harsco Corp.*, 433 S.E.2d 608 (Ga. App. 1993)........................28

*Powell v. J.T. Posey Co.*, 766 F.2d 131 (3d Cir. 1985) ...........................29

*Prather v. Upjohn Co.*, 797 F.2d 923 (11th Cir. 1986) ...........................26

*R & R Insulation Servs. v. Royal Indem. Co.*, 705 S.E.2d 223
(Ga. App. 2010) ......................................................................... 36, 37

*Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318
(11th Cir. 2014) ..............................................................................15

*Stovall & Co. v. Tate*, 184 S.E.2d 834 (Ga. App. 1971) ...................... 29, 36

*Suzuki Motor of Am., Inc. v. Johns*, 830 S.E.2d 549
(Ga. App. 2019) ......................................................................... 17

*Taylor v. Devereux Found, Inc.*, 885 S.E.2d 671 (Ga. 2023) ..................... 56

*Thornton v. E.I. Du Pont De Nemours & Co.*, 22 F.3d 284
(11th Cir. 1994) ...................................................................*passim*

*United States v. Cruz-Valdez*, 773 F.2d 1541 (11th Cir. 1985) .................. 32

*United States v. Woods*, 450 F. Supp. 1335 (D. Md. 1978) ....................... 32

*Vickery v. Waste Mgmt. of Ga.*, 549 S.E.2d 482 (Ga. App. 2001) ............... 16

*Watkins v. Ford Motor Co.*, 190 F.3d 1213 (11th Cir. 1999) ...............*passim*

*Weatherby v. Honda Motor Co.*, 393 S.E.2d 64 (Ga. App. 1990) ........... 20, 44

*Weisgram v. Marley Co.*, 528 U.S. 440 (2000) ...................................... 53

*Westbrook v. Atlanta Gas Light Co.*, 795 S.E.2d 320
(Ga. App. 2016) ..................................................................... 34, 35

*Whatley v. Nat'l Servs. Indus.*, 492 S.E.2d 343 (Ga. App. 1997) ................ 28

*Whirlpool Corp. v. Hurlbut*, 303 S.E.2d 284 (Ga. App. 1983) .............. 16, 19

*White v. Ga. Power Co.*, 595 S.E.2d 353 (Ga. App. 2004) ........................ 59

*Whitehead v. Green*, 879 S.E.2d 698 (Ga. App. 2022) ............................. 29

*Wilson Foods Corp. v. Turner*, 460 S.E.2d 532 (Ga. App. 1995) ........... 16, 28

*Woods v. A.R.E. Accessories*, 815 S.E.2d 205 (Ga. App. 2018) ................. 49

*Yarbrough v. Sears, Roebuck and Co.*, 628 So.2d 478 (Ala. 1993) .............. 41

*YMCA v. Bailey*, 146 S.E.2d 324 (Ga. App. 1965) ................................. 21

**Statutes**

O.C.G.A. § 51-1-11(b)(2) ............................................................... 42

O.C.G.A. § 51-1-11(c)..................................................................... 42

**Rules**

Ga. Ct. App. Rule 33.2(a)(2) ............................................................ 34

**Regulations**

49 C.F.R. § 393.67(e) ................................................................7, 45

## PRELIMINARY STATEMENT

Anthony Leslie crashed a Freightliner Columbia tractor and trailer (the "truck") at a high speed into stopped traffic on I-16 in Georgia. Leslie was severely burned in the crash, and he and his former wife sued Daimler Truck North America ("DTNA"), formerly known as Freightliner, LLC, who designed and manufactured the truck.

Plaintiffs allege that the truck was negligently designed because its fuel system created an unreasonable risk of harm from post-crash fires and that DTNA failed to warn about the danger. After careful consideration of Georgia law and the evidence, the district court entered summary judgment for DTNA because (1) Georgia's 10-year statute of repose barred Plaintiffs' negligence claim and Plaintiffs did not have the evidence of recklessness needed to establish an exception to the statutory bar, and (2) Plaintiffs could not establish any element of their warning claim as a matter of law.

Plaintiffs argue for reversal, but their arguments on appeal are only unsupported rhetoric. They say the record is large and complex and so there must be a material factual dispute somewhere, but they point to no actual *evidence* of one. They contend the law is complex and changed when the Georgia Supreme Court decided *Ford Motor Co. v. Cosper*, but none of that is true either and even their counsel said as much. *See* R-329 at 49 (stating *Cosper*

simply "added clarity to" but "did not change the law"). A straightforward application of controlling law to the record shows that summary judgment was warranted and, indeed, required. This Court should affirm.

## COUNTERSTATEMENT OF THE ISSUES

1.  Whether the district court correctly entered summary judgment on Plaintiffs' negligent design claim because they adduced no evidence that DTNA designed its truck with a willful, wanton, or reckless disregard for life and thus did not establish an exception to Georgia's statute of repose?

    Suggested Answer: Yes.

2.  Whether the district court correctly entered summary judgment on Plaintiffs' failure to warn claim because they adduced no evidence showing a duty to warn, breach, or proximate causation?

    Suggested Answer: Yes.

## COUNTERSTATEMENT OF THE CASE

### A.  The Parties

Plaintiffs-Appellants are Anthony Leslie ("Leslie"), the driver of the truck, and his former wife, Tanyeka Leslie. Defendant-Appellee DTNA designed and manufactured the truck. At the time of the crash, Leslie was a 9-year veteran professional truck driver with a Commercial Driver's License ("CDL"). R-267-21 at 29-30 (RFA Resp.).

**B.    Factual Background**

**1.    The Collision**

On January 31, 2017, Leslie was driving at a high speed eastbound around 7:30 a.m. as the sun was rising when he crashed the truck into another tractor-trailer stopped in traffic on I-16.  R-267-21 at 34-35 (RFA Resp.); R-267-23 at 2-4 (Crash Report).

Leslie regularly drove this route—up to five times a week.  R-99 at 33, 37-38, 61, 63 (Leslie Dep.).  Despite that, he was neither wearing sunglasses nor using his sun-visor to protect from early morning sun glare.  R-267-25 at 6; R-99 at 39 (Leslie Dep.).  During this particular drive, Leslie was talking on the phone and texting with his cruise control set at 71 miles per hour.  *Id.* at 355 (call records); *id.* at 351 (texting records); R-267-26 (screenshots of texts); R-267-21 at 35 (RFA Resp.); R-267-25 at 4-5 (Dep.).  The crash occurred while Leslie was on the phone and not checking his speedometer, and Leslie estimated he was going 71 miles per hour shortly before striking the stopped tractor-trailer.  R-267-25 at 4, 6 (Dep.).

Seconds before impact, Leslie noticed stopped traffic and began braking and put his visor down.  R-267-25 at 6 (Leslie Dep.); R-267-24 at 2 (Granat Report).  Trying to avoid impact, he turned to the left, directing the truck across the left lane of traffic toward the center median, but it was too late—Leslie hit

3

the tractor-trailer in front of him, with the two vehicles overlapping by approximately 40% upon collision. R-267-24 at 2-4. The crash propelled the stopped tractor-trailer over 53 feet into another tractor-trailer that itself was propelled over 148 feet forward and off the road. R-267-23 at 4-5 (Crash Report).



R-267-23 at 2 (Granat Report).



R-267-23 at 4 (Crash Report).



R73-1 at 13 (Kennett Report).

The damage was catastrophic. The heavy steel trailer Leslie hit was deformed; its rear axle was displaced forward, forcibly dismounting the left rear outer tire and heavily deforming the outer wheel. *Id.* As for Leslie's vehicle, the massive collision heavily damaged the right side of the engine and the passenger side of the cab. R-267-24 at 4 (Granat Report) (showing "heavy impact deformation" to the front of Leslie's trailer). What survived of the truck's engine was forced backwards, causing extensive damage to the frame and other components. R-267-24 at 3 (Granat Report). The collision also resulted in a breach of the fuel tank and resulting fire. R-337 at 2 (Op.).



R-293-9 at 32 (Kennett Report showing damage to trailer Leslie hit).



R-267-23 at 4 (Granat Report showing damage to Leslie's trailer).

Once the fire ensued, Leslie reacted immediately to extricate himself from the truck, R-267-19 at 16-17 (Oduor Dep.), but tragically, suffered severe burns.

## 2. The Truck

Leslie was driving a 2005 Freightliner Columbia tractor and trailer, a Class VIII heavy truck with a gross vehicle weight rating of over 33,001 pounds. R-267-21 at 25-26 (Leslie RFA Resp.). It was manufactured and sold by DTNA in January 2005—12 years before the crash. R-267-22. It is one of approximately 1.4 million Class VIII Freightliners DTNA manufactured between 1990 and 2017, which, collectively, drive 100 to 200 billion miles a year. R-305-4 at 9 (Moore Dep.). DTNA's trucks—along with all other heavy trucks in the United States—are built with large diesel fuel tanks attached outside the frame rails, as is necessary to carry the volume of fuel needed for long-distance shipping. R-267-4 at 5 (Herbst Dep.).

### a. Design and Testing of the Truck

The truck was designed in compliance with all safety regulations and federal standards, R-267-4 at 3 (Herbst Dep.), including on the location of the fuel tanks, which Federal Motor Carrier Safety Regulations authorize be placed outside the frame rails. 49 C.F.R. § 393.67(e). DTNA, however, did not rest on that alone—it participated in numerous safety studies and tests and modified its design accordingly over a three-year period from 1992 to 1995. R-267-2 at 2.

For instance, DTNA participated in an extensive study—the 1989 Heavy Truck Fuel System Safety Study—conducted by the National Highway Traffic

7

Safety Administration ("NHTSA") with the University of Maryland ("Maryland Study"). *See* R-267-8. As Plaintiffs' expert acknowledged, the Maryland Study is the most comprehensive study of post-crash fires in heavy trucks. R-267-4 at 4 (Herbst Dep.).

Among other things, the Maryland Study considered the risks and benefits of relocating the fuel tanks but, after careful study and analysis, determined that "[a] less vulnerable position is not apparent[.]" R-267-8 at 114. As the Study explained, "[i]mplementation of any mitigation strategy requires careful consideration to assure that potential changes do not create new breach mechanisms. This is particularly true for fuel tanks." *Id.* For example, "[f]uel tanks could be placed more centrally behind the cab, but this might result in new breach mechanisms during jackknife accidents." *Id.*

Consistent with federal regulations, the Maryland Study's results, and all other American heavy trucks, DTNA located its fuel tanks outside the frame rails. R-267-4 at 5 (Herbst Dep.).



**2005 Freightliner Columbia**



**2005 Peterbilt 385**



**2005 International 9400i**



**2005 Mack CXN 613**



**2005 Volvo VNL64T630**

R-267-1 at 5, R-267-9 at 5-6.

Further informed by the Maryland Study, DTNA also made multiple design changes to increase safety and mitigate risk. DTNA changed the thickness of the fuel tank and increased the strength of the fuel tank fittings. *Id.* at 5-6 (Moore Dep.). It also changed the fuel tank mounting system. *Id.* at 5.

More still, DTNA changed the fuel tanks' diameter, increased the clearance between the ground and the tanks, and strengthened the straps that attach them to the mounts. *Id.* at 6.

DTNA also made additional modifications informed by its own safety testing above and beyond any regulatory requirement, including multiple full-scale crash tests with independent testing facilities[1] and product validation testing on individual design components. R-267-10 at 6-7 (Moore Dep.); R-267-3 at 13-14 (Moore Dep.) (describing measures to mitigate risk of fuel tank puncture). DTNA specifically evaluated strategies to reduce the risk of post-crash fires. *See* R-267-5 (1978 Fuel System Design); R-267-6 (1981 Fuel System Evaluation Guide); R-267-7 1990 (Fuel System Integrity).

### b. The Truck's Safety Warnings

DTNA provided numerous warnings and safety instructions in the truck's Driver's Manual to apprise professional drivers of the risks inherent in driving a 33,000-pound, fuel-powered vehicle. These warnings included that fuel tanks can "rupture from impact," "causing fire" and "serious personal injury." R-268-9 at 368. The Manual also stated that "In Case of a Cab Fire," drivers

---

[1] *See also* R-267-11; R-267-12; R-267-13; R-267-14, R-267-15.

should, "[a]s quickly as possible, bring the vehicle to a safe stop, apply the parking brake, turn off the ignition, and get out of the vehicle." *Id.* at 370.

In addition to DTNA's warnings, the Georgia Commercial Driver's License Manual, on which drivers are trained and tested, alerts that "[t]ruck fires can cause damage and injury" and "some causes of vehicle fires" include "After Accidents. Spilled fuel[.]" R-99 at 359 (§2.21). Leslie was tested on the CDL Manual to receive his license. R-267-21 at 29-30 (Leslie RFA Resp.).

## C. Procedural History

### 1. The Complaint

On August 10, 2018, Plaintiffs filed their complaint. R-1. Count I asserted a claim for negligence and alleged, presumably to overcome Georgia's 10-year statute of repose, that DTNA manifested a willful, reckless, or wanton disregard for life or property in designing the truck. *Id.* at 5-10. Count II alleged DTNA failed to warn of its dangers. *Id.* at 11-12. The complaint also sought punitive damages (Count III) and loss of consortium (Count IV). *Id.* at 13-15.

### 2. The Summary Judgment Decision

DTNA moved for summary judgment (R-267-1), which was granted (R-337).

As DTNA explained, Plaintiffs' negligent design claim was barred by Georgia's statute of repose. R-267-1 at 11. While Plaintiffs invoked a statutory exception permitting claims where a manufacturer engaged in willful, wanton, or reckless disregard for life, the district court held "[t]here is simply no evidence that [DTNA]'s conduct" met that standard and, indeed, uncontroverted evidence showed DTNA had a thorough design process, made many safety enhancements, and exceeded government standards. R-337 at 7-9, 22. Plaintiffs had no evidence of any safer and feasible alternative design, resting their case on only untested and never-adopted theoretical concepts imagined by their expert. But as the court explained, "Plaintiffs cannot create a genuine issue of material fact … with an after-the-fact expert opinion … espousing alternative designs or concepts that have not been shown to be compliant with … [r]egulations or accepted by any commercial manufacturer[.]" *Id.* at 22.

On Plaintiffs' warning claim, DTNA explained how it failed as a matter of law on each element: (1) duty, (2) breach, and (3) causation. R-267-1 at 19-25. The court agreed, holding DTNA "had no duty to warn [Leslie] of the dangers of post-collision fuel-fed fires"—an open and obvious risk—and even if it did, DTNA "did provide a warning." R-337 at 27. And "[i]t would be absurd for a jury to have [to] consider a failure to warn claim based on [the] alleged inadequacy" "that [the warning] did not tell drivers to get away from the fire[.]"

*Id.* More still, "any alleged inadequacy of the warning in the Driver's Manual cannot be the proximate cause of his injuries because Mr. Leslie never read it." *Id.* at 28.

## SUMMARY OF THE ARGUMENT

In a thorough and soundly reasoned opinion, the district court correctly entered summary judgment for DTNA. Plaintiffs cry foul, but their appeal brief suffers from the same pervasive problem as their district court papers: they declare summary judgment improper, but point to no evidence creating a genuine factual dispute warranting a trial.

***Failure to warn claim.*** Plaintiffs did not, and could not, meet their burden to adduce evidence on even one of the elements of this claim, let alone all three. There is no duty to warn a professional truck driver of an admittedly known and obvious risk. There is no breach because DTNA's Driver's Manual did warn that a fire could result if the fuel tank is breached and no evidence demonstrates that locating that warning in the Manual was legally inadequate. There is no evidence of proximate causation, as Leslie never read the Manual and neither he nor Plaintiffs' expert could say a different result would have occurred if he had.

***Negligent design claim.*** Plaintiffs agreed the statute of repose bars their claim absent evidence demonstrating a willful, wanton, or reckless disregard for

life in designing the truck. That is an exacting standard—one Plaintiffs did not meet. They focus on recklessness but point to no evidence showing, as Georgia law requires, that DTNA engaged in a "conscious choice of a course of action" it knew or should have known would create "a high degree of probability that substantial harm" would result. *Ford Motor Co. v. Cosper*, 893 S.E.2d 106, 116-18 (Ga. 2023) (citations omitted). Indeed, uncontroverted evidence showed DTNA carefully designed its truck to reduce the risk of post-crash fires.

In the end, the gist of Plaintiffs' argument is that summary judgment rarely should be granted. But "[s]ummary judgment … is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citation omitted). So it is here.

## STANDARD OF REVIEW

This Court's review is *de novo*. *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). To survive summary judgment, a plaintiff must produce sufficient evidence from which a reasonable trier of fact could rule in its favor. *Celotex*, 477 U.S. at 331. Summary judgment therefore is proper where the plaintiff fails "fails to make a showing sufficient to establish the existence of an element essential to [its] case[.]" *Id*. at 322. As for the nature of the proof

required, the plaintiff must adduce ***specific material evidence***. Mere allegations, allusions to facts, references to the pleadings, or conjecture will not suffice. *Id*. at 324; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318, 1321 (11th Cir. 2014) ("'merely colorable' or 'not significantly probative'" evidence fails) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). As for the quantum of the proof required, "a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## ARGUMENT

### I. The District Court Correctly Entered Summary Judgment On Plaintiffs' Failure To Warn Claim

Plaintiffs' claim is based on the theory that DTNA failed to warn Leslie, a professional truck driver, of a known and obvious risk of post-crash fires and what do in a fire. That theory fails on the facts and the law. DTNA explains below why the district court's decision is correct (§I.B) and why nothing Plaintiffs have to say on appeal shows otherwise (§I.C).

#### A. Georgia Law On Warning Claims

"Under Georgia law, a manufacturer has a duty to warn of nonobvious foreseeable dangers from the normal use of its product." *Thornton v. E.I. Du Pont De Nemours & Co.*, 22 F.3d 284, 289 (11th Cir. 1994). "Georgia law

insists that a plaintiff show [1] that the defendant had a duty to warn, [2] that the defendant breached that duty, and [3] that the breach proximately caused the plaintiff's injury." *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010).

***Duty to warn***. A "duty to warn arises whenever the manufacturer knows or reasonably should know of the danger arising from the use of its product." *Chrysler Corp. v. Batten*, 450 S.E.2d 208, 211 (Ga. 1994). Whether a duty exists "depends upon foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger." *Wilson Foods Corp. v. Turner*, 460 S.E.2d 532, 533 (Ga. App. 1995). This is a "legal question." *CertainTeed Corp. v. Fletcher*, 794 S.E.2d 641, 645 (Ga. 2016).

Manufacturers owe ***no*** duty to warn in certain circumstances as a matter of well-settled Georgia law. There is no duty to warn product users who have "actual knowledge" of a risk—in those cases, the danger is already foreseen. *Whirlpool Corp. v. Hurlbut*, 303 S.E.2d 284, 288 (Ga. App. 1983) (citation omitted).

Similarly, no duty is owed "where it appears that the person using the product ***should*** know of the danger, or ***should*** in using the product discover the danger." *Id.* at 288 (emphasis added) (citation omitted). Relatedly, there is "no duty to warn of a product danger that is obvious or generally known." *Vickery*

16

*v. Waste Mgmt. of Ga.*, 549 S.E.2d 482, 484 (Ga. App. 2001). "Whether a danger is open and obvious is determined 'on the basis of an objective view of the product, and the subjective perceptions of the user or injured party are irrelevant.'" *Lamb v. Sears, Roebuck & Co.*, 1 F.3d 1184, 1189-90 (11th Cir. 1993) (citation omitted). Where a "danger is open and obvious, the manufacturer is entitled to judgment as a matter of law." *Id.* at 1190; *D'Elia v. Phillips Edison & Co.*, 839 S.E.2d 721, 724 (Ga. App. 2020) (same).

As a more specific corollary, when a "product is vended to a particular group or profession, the manufacturer is not required to warn against risks generally known to such group or profession." *Eyster v. Borg-Warner Corp.*, 206 S.E.2d 668, 670 (Ga. App. 1974) (citation omitted). Indeed, Georgia courts "ha[ve] held on numerous occasions that where a product is sold to a particular group or profession, there is no duty to warn of risks generally known to that group or profession." *Farmer v. Brannan Auto Parts, Inc.*, 498 S.E.2d 583, 585 (Ga. App. 1998).

**Breach of the duty**. A duty to warn "may be breached by (1) failing to adequately communicate the warning to the ultimate user or (2) failing to provide an adequate warning of the product's potential risks." *Suzuki Motor of Am., Inc. v. Johns*, 830 S.E.2d 549, 557 (Ga. App. 2019) (citation omitted). These are distinct claims. "The first ... centers on issues such as location and presentation"

17

and "the latter ... on the content of the warning, inquiring whether the warning is sufficient to apprize the user of the dangers[.]" *Watkins v. Ford Motor Co.*, 190 F.3d 1213, 1219 (11th Cir. 1999).

*Proximate causation*. The analysis does not "end" with duty and breach, *Hubbard v. Bayer Healthcare Pharmaceuticals Inc.*, 983 F.3d 1223, 1232 (11th Cir. 2020), as a "'plaintiff [also] must demonstrate that the deficient warning proximately caused the alleged injury.'" *Id.* (quoting *Dietz*, 598 F.3d at 816). "[P]roximate causation is a necessary element ... to withstand summary judgment," *Davis v. John Crane, Inc.*, 836 S.E.2d 577, 584 (Ga. App. 2019), and to carry this burden, "the plaintiff must present *evidence* supporting a reasonable inference that the [missing] warning [would have] prevent[ed] the injury," *Ga. Cas. & Sur. Co. v. Salter's Indus. Serv.*, 734 S.E.2d 415, 420-21 (Ga. App. 2012) (emphasis added).

## B. Application of Georgia Law To The Uncontroverted Record Shows That Summary Judgment Was Proper

Plaintiffs' warning claim fails on each element. Summary judgment thus was warranted for three independent reasons.

*No duty*. The district court held that DTNA owed no duty to warn Leslie, a professional truck driver, of the actually known and objectively obvious risk

"of a vehicle catching on fire following a crash." R-337 at 26. That is correct for several reasons.

*First*, there is no duty to warn a plaintiff who has "actual knowledge" of a danger, and uncontroverted evidence established Leslie knew a crash could result in a fire. *Whirlpool*, 303 S.E.2d at 288 (citation omitted). The evidence showed Leslie knew "fuel could leak because of a crash" and "there is a risk of fire if fuel ignites." R-337 at 23 (Op.); *see also* R-99 at 28 (Leslie agreeing that "there's a risk if you have fuel that you could have a fire or an explosion if something ignited" because "fuel is flammable"); R-99 at 56 (similar); R-267-21, ¶¶ 30-32 (admitting "general ... aware[ness] that sometime in the past a heavy truck has spilled fuel as a result of an accident" and "that diesel fuel can ignite"). In fact, Leslie "had seen situations where there had been an accident and there had been a fire" and "knew that ... was a possibility[.]" R-99 at 52-53. And, more generally, Leslie admitted he knew that "a crash in a heavy truck ... could result in injury or death to the driver" and that he "could be seriously hurt or killed." *Id.* at 48, 54; *see also* R-337 at 23.

Leslie's admitted knowledge of the danger alone dooms Plaintiffs' warning claim. *Exxon Corp. v. Jones*, 433 S.E.2d 350, 353 (Ga. App. 1993) (affirming summary judgment because plaintiff "admitted that he was aware of the danger of an explosion from the gas leakage"); *Daniels v. Bucyrus-Erie Corp.*,

19

516 S.E.2d 848, 850 (Ga. App. 1999) (same, because plaintiff "was keenly aware of the very risks about which [plaintiff] claims he should have been warned"); *Bodymasters Sports Indus. v. Wimberley*, 501 S.E.2d 556, 561 (Ga. App. 1998) (similar).

*Second*, and independent of Leslie's actual knowledge, the dangers of fuel-related fires in highway collision are perils a professional truck driver "should recognize." *Lockman v. S.R. Smith, LLC*, 405 F. App'x 471, 473 (11th Cir. 2010) (citation omitted) (unpublished). Thus, apart from Leslie's "subjective" understanding, the risks were "open and obvious" as an "objective" matter, *Lamb*, 1 F.3d at 1189-90, especially to licensed drivers in the trucking "profession." *Thornton*, 22 F.3d at 289; *see Weatherby v. Honda Motor Co.*, 393 S.E.2d 64, 67-68 (Ga. App. 1990) ("dangers of spilled gasoline coming into contact with an engine" is "an obvious or patent peril") (overruled in part and on other grounds, *Ogletree v. Navistar Intern. Transp. Corp.*, 500 S.E.2d 570 (Ga. 1998)).[2]

---

[2] Although *Ogletree* held that an open and obvious risk was not an absolute defense for a design defect claim, it left untouched the cases—including this Court's decision in *Lamb*—deeming an open and obvious risk dispositive on a failure to warn claim, the rule in "most jurisdictions." *Ogletree*, 500 S.E.2d at 572. This Court is "bound by [its prior] panel's interpretation of Georgia law unless and until Georgia's courts tell us [*Lamb*] interpreted Georgia law incorrectly"—which they have not. *Hubbard*, 983 F.3d at 1238.

The facts bear this out. Professional drivers are apprised of the risk of crash-related fires in the CDL Manual—designed to "comply with the standards, rules and laws set by the state of Georgia"—and on which professional drivers, like Leslie, had to pass an examination, R-99 at 357, 23-24. As the Manual informs, "[t]ruck fires can cause damage and injury." R-99 at 359. And so, the Manual instructs members of the profession to "[l]earn the causes of fires and how to prevent them," noting that "some causes of vehicle fires" include "Spilled fuel" "After Accidents." *Id.* Thus, the district court correctly concluded that "[i]t is well-known that gasoline and diesel fuel are flammable and that vehicle accidents sometimes result in fuel-fed fires. Objectively speaking, the danger of a post-crash fire is open and obvious." R-337 at 26.

In the end, "the purpose of a warning is to supply a party with information which he is not presumed to have." *YMCA v. Bailey*, 146 S.E.2d 324, 336 (Ga. App. 1965). But here, the dangers, however characterized, were already reasonably known. As such, no further warning was necessary. *See Moore v. ECI Mgmt.*, 542 S.E.2d 115, 121 (Ga. App. 2000) (affirming summary judgment because "[t]he danger of electrocution from miswiring an electrical appliance should be both open and obvious to an experienced installer"); *Niles v. Bd. of Regents*, 473 S.E.2d 173, 176 (Ga. App. 1996) (affirming directed verdict because there was no "duty to warn a student with a degree in chemistry of the

dangers of mixing these common chemicals"); *Eyster*, 206 S.E.2d at 670 (same, because "the specific danger of the aluminum-copper connection was one commonly known to those in the trade").

*No breach.* Even if there were a duty to warn professional truck drivers of the obvious risk that a fire could occur in a highway crash, Plaintiffs did not adduce evidence of a breach. Summary judgment was proper for this reason as well, because there is no evidence that the content of the warning or the method of communicating it were legally deficient.

*First*, no breach occurs where, as here, "the content of the warning … is sufficient to apprize the user of the dangers associated with the use of the product." *Watkins*, 190 F.3d at 1219. DTNA's Driver's Manual warns that fuel tanks can "rupture from impact," "causing fire" and "serious personal injury." R-268-9 at 368; *see* R-337 at 27 (Op.) (explaining Manual warned "there is a risk of fire if the fuel tank is ruptured or breached from an impact"). The Manual also instructs users what to do "[i]n an Emergency." R-268-9 at 369-70. "In Case of a Cab Fire," drivers should, "[a]s quickly as possible, bring the vehicle to a safe stop, apply the parking break, turn off the ignition, and get out of the vehicle." *Id.* at 370. The Manual cautions that, while the "incidence of fire … is rare, according to data from the National Highway Traffic Safety Administration[,]" "most materials will burn" and "[t]he cab of this vehicle

contains urethane foam, which is flammable." *Id.* The warning then reminds drivers to "not allow any flames, sparks, or other heat sources ... to contact any surfaces of the cab interior" which "could cause serious personal injury" and that a "fire extinguisher is located in the cab by the driver's door." *Id.* at 369-70.

These statements clear the bar, apprising users "of the hazards connected with [the product's] use" in a way "reasonably calculated to reach the average user" through "clear and simple language." *Thornton*, 22 F.3d at 289; *see, e.g.*, *Farmer*, 498 S.E.2d at 585 (warning that "informed [plaintiff] the substance was flammable; that it should not be used near heat or flame; and that it would remain flammable when transferred" alerted that "substance could explode if exposed to heat"). That is especially true here, given that "[t]he adequacy of the warning must be evaluated in conjunction with the knowledge and expertise of those who may be reasonably expected to use" the product, *Thornton*, 22 F.3d at 289—here, professional drivers who already understand crash-related fire risks. *See supra* 20-21.

Plaintiffs' expert all but conceded the warning's adequacy. Dr. Oduor had no trouble understanding the risks conveyed—even though she was not a professional driver, had no prior experience with heavy truck warnings, and never assessed the information professional drivers already have. R-268-9 at 68-

70 (Oduor Dep.). When asked about "the way to avoid the impact" and fuel-tank "rupture" described, Dr. Oduor conceded it would be fair to "assume that an accident is the way in which that would occur." *Id.* at 92; *see also id.* at 92-93 (admitting that, in addition to not over-filling the tank, "the other way to reduce the risk of rupture from impact is to avoid having the impact to begin with").[3]

And while Dr. Oduor initially opined that DTNA "does not provide any context around the postcollision situation and the fact that you need to move away" or "instructions on how you can move away" from a truck that is on fire, *id.* at 10-12, she ultimately conceded that the warning ***does*** in fact "tell[] the driver what to do in case of a cab fire," instructing "to get out of the vehicle as quickly as possible after you bring it to a stop," *id.* at 105.[4] Moreover, the

---

[3] Plaintiffs suggest that the warning does not count because it is coupled with an admonition that the tank should not be filled more than 95%. OpeningBr.28. That admonition, however, does not take away from the language stating that a tank could "rupture" on "impact" and cause death or injury, especially considering the obviousness that such a danger could result because of a collision. *See Cobb Heating Co. v. Hertron Chemical Co.*, 229 S.E.2d 681, 682 (Ga. App. 1976) (rejecting similar challenge to warning that read, "'Caution – Flammable Mixture. Do not use near fire or flame,'" because "[w]e need not indulge in semantical or technical sophistry to conclude that an electric burner on a stove has the same effect as a 'fire or flame'").

[4] Dr. Oduor also failed to offer any alternative warning—either one she crafted, or one used by another manufacturer. R-268-9 at 62, 66.

"alleged inadequacy of this warning, that it did not tell drivers to get away from the fire, fails to give due consideration to basic common sense." R-337 at 27 (Op.).

**Second**, the "location and presentation" of the warning in the Driver's Manual was legally appropriate. *Watkins*, 190 F.3d at 1219. Plaintiffs argue it should have been posted in the truck's cab instead, because sometimes (as apparently here) the Manual is not available in the truck. Opening.Br.30-31. But as the district court explained, with hundreds of pages of instruction and dozens of warnings relating to operating a complex, heavy truck, the "only practical place to put the many warnings ... is in the Driver's Manual." R-337 at 25.

That conclusion aligns with the law. *See Lockart v. Kobe Steel Ltd. Constr. Mach. Div.*, 989 F.2d 864, 868 (5th Cir. 1993) (there could be "many warnings ... [just] as worthy of display" but with "complex" products, "it is simply impractical to place all these on the product rather than in a manual"); *Broussard v. Cont'l Oil Co.*, 433 So.2d 354, 358 (La. App. 1983) (printing every conceivable risk on a product "would decrease the effectiveness of all of the warnings" because the "consumer would have a tendency to read none"); *Gen. Motors Corp. v. Saenz ex rel. Saenz*, 873 S.W.2d 353, 360-61 (Tex. 1993) (where "it is important to give a number of instructions concerning the operation

of a vehicle, not all of them can be printed on the dashboard" and the "owner's manual" is sufficient); *Magoffe v. JLG Indus.*, 375 F. App'x. 848, 852 (10th Cir. 2010) ("common sense dictates a [professional] would consult the service manual" for "critical" safety information which has not been "specifically passed" onto them) (affirming summary judgment) (unpublished).

Indeed, Plaintiffs' expert conceded DTNA's Manual "would be an appropriate place to place a warning[.]" R-268-9 at 171. And she likewise agreed "it would be counterproductive ... to be putting dozens and dozens of warnings on placards within the cab." *Id.* at 179; *id.* at 180 (stating further that she "did not" and "would not" suggest that alternative be attempted).

With even their own expert rejecting their impractical liability theory, no "reasonable jury could" rule for Plaintiffs. *Prather v. Upjohn Co.*, 797 F.2d 923, 927 (11th Cir. 1986) (directed verdict) (per curiam). This Court's application of analogous warning principles in *Prather* is instructive. There, like here, the manufacturer "sold its polyurethane foam exclusively to knowledgeable industrial consumers" who "had independent knowledge of the hazards inherent in burning polyurethane foam" and, so, "the "warnings [it] issued concerning the potential hazards of burning the foam were therefore designed accordingly." *Id.* at 924-25. The manufacturer made the warnings available to the commercial purchaser of the product, the plaintiff's employer, through "a forty page

reference guide" and "package safety inserts." *Id.* at 925. Despite that, the warnings did not reach the plaintiff. *Id.* Like here, the plaintiff insisted that the manufacturer should have "placed [the warnings] on the foam [itself] in such a position that the ultimate user would be likely to see [them]." *Id.* at 927. But, like here, "the evidence established that the [plaintiff's] suggestion was not feasible" because even his own "experts ... did not mention that the [plaintiff's] suggested method ... was feasible or more likely to reach the ultimate user than [the current] practice[.]" *Id.* Plaintiffs' case is equally deficient.

*No proximate cause.* Plaintiffs did not adduce evidence showing that the absence of a warning proximately caused Leslie's injuries.

*First*, "any alleged inadequacy of the warning in the Driver's Manual cannot be the proximate cause of [Plaintiffs'] injuries because Mr. Leslie never read it." R-337 at 28 (Op.). That is dispositive under Georgia law on a challenge to the content of a warning. *See Ivy v. Ford Motor Co.*, 646 F.3d 769, 773 n.2 (11th Cir. 2011) ("'[W]here there is no evidence that a plaintiff read the allegedly inadequate warning, causation cannot be shown.'") (quoting *Dozier Crane & Mach., Inc. v. Gibson*, 644 S.E.2d 333, 336 & n.8 (Ga. App. 2007)); *Thornton*, 22 F.3d at 290 (same; affirming summary judgment); *Henry v. Gen.*

*Motors Corp.*, 60 F.3d 1545, 1548-49 (11th Cir. 1995) (same; affirming summary judgment).[5]

**Second**, as for Plaintiffs' critique of way the warning was conveyed, "no evidence supports a reasonable inference that" some other method, "[e]ven … hand-delivering him copies of" the warning, "would have prevented the accident." *Niles*, 473 S.E.2d at 176. Leslie, as he admits, already knew to avoid collisions and "knew, as common-sense dictates, to get away from the fire, and he tried to do just that." R-337 at 27; *see* R-268-9 at 110-11 (Oduor Dep., conceding as much). Already "fully aware" of danger and how to react, and having acted accordingly, any "further warning to [him] would have been superfluous." *Whatley v. Nat'l Servs. Indus.*, 492 S.E.2d 343, 347 (Ga. App. 1997) (affirming summary judgment); *see Farmer*, 498 S.E.2d at 585 (same, because "failure … to provide [plaintiff] with its knowledge of the danger did not proximately cause [his] injuries because [he] already knew the substance was flammable").

Leslie, unsurprisingly, "could not say what, if anything, [he] would have done differently if [he] had received [the] warnings" he claims should have been

---

[5] *Accord Cobb Heating*, 229 S.E.2d at 682; *McCleskey v. Olin Mathieson Chem. Corp.*, 193 S.E.2d 16, 18-19 (Ga. App. 1972); *Powell v. Harsco Corp.*, 433 S.E.2d 608, 610 (Ga. App. 1993); *Wilson Foods*, 460 S.E.2d at 534.

plastered on the truck. *Whitehead v. Green*, 879 S.E.2d 698, 714-15 (Ga. App. 2022). Nor could his expert say that an alternative location would have changed the outcome. R-268-9 at 64-66, 72 (Oduor Dep.). This, too, dooms Plaintiffs' claim. *See Powell v. J.T. Posey Co.*, 766 F.2d 131, 135 (3d Cir. 1985) (concluding that the "accident still would have occurred" no matter whether "manufacturer … placed a warning in its literature, on the [product] itself, or even on the door of [the patient's] room"); *Whitehead*, 879 S.E.2d at 714 (similar).

Providing warnings in DTNA's Driver's Manual as opposed to somewhere else did not cause Leslie to crash his truck. Plaintiffs thus failed to "introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result" and, so, it was "the duty of the court" below to enter judgment "for the defendant." *Niles*, 473 S.E.2d at 176 (citation omitted).

\* \* \*

"[W]hether through experience and plain common sense," or "through the safety advice contained in" DTNA's Manual, "the evidence is that [Leslie] recognized the potential danger" of a crash and fire and tried to avoid it. *Stovall & Co. v. Tate*, 184 S.E.2d 834, 840 (Ga. App. 1971). As such, DTNA's

"warning was effective, or cumulative at least" of known information and, so, granting "the manufacturer's motion for summary judgment" was proper. *Id.*

## C. Plaintiffs' Arguments Do Not Refute What Georgia Law And The Evidence Command

On appeal, Plaintiffs offer a variety of theories of error on their warning claim. None withstand scrutiny.

*No duty.* Plaintiffs try to manufacture a duty to warn that neither Georgia law nor the record supports. They first assert that a duty was owed because DTNA's corporate designee stated that a frontal collision is the most common and foreseeable type of vehicular collision and that in some frontal collisions, front portions of the truck can be pushed backwards against the fuel tank. Opening.Br.13-14.

But that commonness and foreseeability does make Plaintiffs' claim, it defeats it. True, manufacturers must warn of foreseeable dangers. But no warning is needed when the risk was foreseen by or foreseeable to a reasonable user, as is the case here. *See supra* 16-17, 19-22. The fact that DTNA's corporate designee agreed that a frontal collision was "statistic[ally]" the most

common and foreseeable crash only further reinforces the obviousness of the risk to a sophisticated user like Leslie.  Opening.Br.13 (quoting R-293-4 at 35-36).[6]

Next, Plaintiffs take aim at the determination that Leslie was a sophisticated user of heavy trucks, *see* Opening.Br.15-19, but their critiques are just nit-picks.  For example, they argue that Leslie's commercial driver's license training "did *not* include instruction on any risk of post-collision fuel-fed fires" because Leslie—11 years later in his deposition—could not "'recall that from [his] training.'"  *Id.* at 16 (quoting R-99 at 51).  Plaintiffs also point to Leslie's deposition testimony that he could not "recall ever reading the CDL Manual," *id.* at 17, despite having passed an examination on it to obtain his license.

These critiques are pedantic and immaterial.  Even fully crediting Leslie's failure to remember these details, the fact remains that Leslie was a 9-year veteran of the trucking profession deemed aware of risks generally known in it. And, as to that knowledge, Plaintiffs do not deny that Leslie admitted:  he was aware that an accident could cause heavy trucks to spill fuel; diesel fuel could ignite; spilled fuel could cause a fire or explosion; being in a crash could result

---

[6] Plaintiffs also point to 72 other incidents in which trucks experienced post-collision fires.  Opening.Br.14.  Besides the fact that that does not displace the openness and obviousness of the risk, Plaintiffs' depiction of this figure is misrepresentative, amounting to only 0.005% of total trucks.  *See infra* 54.

in serious injury and death; and he had actually seen post-crash fires. *See supra* 19. Moreover, as a legal matter, neither Leslie's faded memory nor his "subjective appreciation of the danger" control. *Cates v. Zeltiq Aesthetics, Inc.*, 73 F.4th 1342, 1349 (11th Cir. 2023) (citation omitted; applying analogous Florida law principles). Instead, controlling law requires an "objective" evaluation of what a ***reasonable*** professional driver would know, *Lamb*, 1 F.3d at 1189-90, and that includes the risk of a post-crash fire.

To further illustrate this point, the district court noted that crash-related fires are "portrayed in countless T.V. shows and movies[.]" R-337 at 25-26. Plaintiffs fault the court for not specifically identifying the shows and movies and, to support that criticism, cite an "entertainment.howstuffworks.com" article opining that media depictions are inaccurate. Opening.Br.26. But the court's observation was just a way of pointing out the obviousness of the risk.[7] In any event, the movie and T.V. reference was not the basis for the court's summary

---

[7] *See United States v. Cruz-Valdez*, 773 F.2d 1541, 1546-47 (11th Cir. 1985) ("[W]e frequently take into account matters of common sense or general knowledge" because "[w]hat everybody knows the court must know") (citation omitted); *United States v. Woods*, 450 F. Supp. 1335, 1345 (D. Md. 1978) ("[D]estruction caused by modern automobiles is the subject of daily comment in the press, on television and radio, and among the populace").

judgment decision, which instead was based on a point-by-point application of Georgia law to undisputed evidence.

Unable to identify any error in that point-by-point analysis, Plaintiffs try to move the legal goalpost. They argue Leslie was owed a warning because his "knowledge" of the product's risks was not "equal" to DTNA's. Opening.Br.15, 19, 20. But that is not the standard. A warning is not owed just because a manufacturer has "superior knowledge" about a product. *Hunter v. Werner Co.*, 574 S.E.2d 426, 431 (Ga. App. 2002) (citation omitted). That is virtually always the case and so Georgia law instead sensibly holds that no warning is owed when product risks are known, knowable, or open and obvious to a user—without need to compare his or her knowledge against the manufacturer's. *See supra* 16-17.

*No breach.* Plaintiffs' breach arguments fare no better.

*First*, they argue that DTNA's warning was inadequate because the Driver's Manual—although warning of fuel-related fires—did not provide a "*specific*" explanation of how the fire could occur—that is, it did not detail that in a "frontal collision[,] the axle could move rearward and could compromise the fuel tank and could lead to a fire or explosion." Opening.Br.19, 23 (citation omitted). Doubling-down on this theory, Plaintiffs argue that the CDL Manual—although warning that "'some causes of vehicle fires'" include "'After

Accidents'" and "'Spilled fuel'"—did not include a granular, technical explanation on *how* such fires could ensue—namely, via "a breach of the fuel tank and the [ignition of] *vapor* emissions." *Id.* (citation omitted).

This theory is legally unsupportable. Georgia warning law requires only "clear and simple language," "reasonably calculated to reach the average user," *Thornton*, 22 F.3d at 289, and "sufficient to apprize the user of the dangers associated with the use of the product." *Watkins*, 190 F.3d at 1219. There is no obligation to burden a warning with the precise technical or scientific processes that cause those dangers.

On this point, *Westbrook v. Atlanta Gas Light Co.*, 795 S.E.2d 320 (Ga. App. 2016) is instructive.[8] There, the plaintiffs claimed that the defendant failed to provide a sufficiently detailed warning about the dangers of a gas leak. The warning, however, stated: "DANGER. This meter or appliance must not be turned on until the condition(s) indicated below have been corrected .... Leak in fuel line. Left meter off but unlocked for plumber .... Have the qualified

---

[8] One judge concurred in the judgment only. *Id.* at 328 (Dillard, P.J., concurring) ("not agree[ing] with all that is said" but not explaining further). While a 2-judge majority opinion would be binding if issued today, decisions before August 1, 2020 are "physical precedent only (citable as persuasive, but not binding, authority)." Ga. Ct. App. Rule 33.2(a)(2). *Westbrook* is indeed persuasive.

agency/person connect and/or activate the appliance." *Id.* at 321-22. Still, like here, the plaintiffs complained that the warning should have contained more specific details that "turning on the gas 'could cause a catastrophic leak and explosion' or that the gas could be ignited by so benign an act as flipping on a light switch." *Id.* at 327.

The Georgia court disagreed, ruling the warning "substantively adequate as a matter of law" because it "informed [the reader] that he had a leak in his gas system" and "warned that this condition posed a 'DANGER[.]'" *Id.* The law, as the court explained, does not impose "a duty to warn [readers] exactly why the leak posed a danger"—the clear and simple language deployed sufficed. *Id.* The same is true here. *See supra* 22-25.[9]

As a legal matter, there was no "duty to warn [users] exactly why [a fuel tank rupture] posed a danger" or every detail of how such a danger could ensue. *Westbrook*, 795 S.E.2d at 327. "To hold otherwise would be to place upon the

---

[9] Plaintiffs contend that DTNA's corporate representative admitted DTNA "doesn't, in any way, warn drivers of the danger of fire or explosion from foreseeable frontal collisions." Opening.Br.14. But what he actually said is that DTNA does not provide a detailed, technical explanation of how in a "frontal collision the axle could move rearward and could compromise the fuel tank and could lead to a fire or explosion" because "[t]here's an infinite number of possible accident scenarios, and we don't warn our users about every possible accident scenario." R-293-4 at 39-40.

manufacturer the impossible task of cataloging every conceivable way in which injury might result[.]" *Omark Industries, Inc. v. Alewine*, 319 S.E.2d 24, 26 (Ga. App. 1984). The "scope of such warnings would be endless," "'expand[ing] traditional tort concepts beyond manageable bounds and creat[ing] an almost infinite universe of potential plaintiffs.'" *CertainTeed*, 794 S.E.2d at 645 (citation omitted). All the while, the effectiveness and readability of every warning would diminish, diluted in a sea of extraneous detail. *See id.* (cautioning against "impos[ing] a duty that ... cannot feasibly be implemented") (citation omitted).

Thus, for good reason, the law "does not require [the] encyclopedic warning" Plaintiffs envision. *Hood v. Ryobi Am. Corp.*, 181 F.3d 608, 610-11 (4th Cir. 1999) (no duty to "warn of every mishap or source of injury that the mind can imagine") (citation omitted); *see also Stovall*, 184 S.E.2d at 837-38 (no duty to warn "against every injury which may ensue") (citation omitted); *Cates*, 73 F.4th at 1348 (no duty to detail "the severity of the risk" but just to "make apparent the potential harmful consequences' of the product") (citation omitted); *accord* R-337 at 27-28 (Op.).[10]

---

[10] Plaintiffs' reliance on *Camden Oil Co. v. Jackson*, 609 S.E.2d 356 (Ga. App. 2004), *Fouch v. Bicknell Supply Co.*, 756 S.E.2d 682 (Ga. App. 2014), and *R & R Insulation Servs. v. Royal Indem. Co.*, 705 S.E.2d 223 (Ga. App. 2010) is

Continued on following page

**Second**, as for the manner in which the warning was communicated, Plaintiffs argue for reversal because Leslie did have a copy of the Driver's Manual in his truck, and so, in their view, an "on-product" warning should have been used. Opening.Br.30-31.

But again, even Plaintiffs' expert "'agreed that the Driver's Manual would also be 'an appropriate place to provide [the] warning.'" Opening.Br.31 (quoting R-268-9 at 171). And while Plaintiffs insist an "'on-product warning'" would also be "'an appropriate place,'" *id.* (quoting their expert), that is just another attempt to move the goalpost. Just because an alternative location might also be valid does not make this one invalid. *See Saenz*, 873 S.W.2d at 360

---

Continued from previous page

misplaced. None reject the on-point authorities that reveal the error in Plaintiffs' encyclopedic warning demand and all are distinguishable. *Camden Oil* raised a jury question on how a warning was communicated where the product was "used" and "marketed to the general public." 609 S.E.2d at 360. That was key and distinguished the case from others where, as here, the plaintiff "used a product intended for professionals[.]" *Id.* *Fouch* raised a jury question but only where tangible evidence suggested a demonstrable need for a more specific warning in the setting of "small employers" who were "not aware" of a nonobvious danger. 756 S.E.2d at 690. Finally, this record does not resemble *R & R Insulation*, where the defendant specifically "recommended certain installation methods" and the risks of the "particular product" installed were not "necessarily" obvious, as different classes of the product, fiberglass reinforced plastic, have "various levels of fire retardant material[.]" 705 S.E.2d at 234.

("Plaintiffs' argument that the warning could have been more prominent does not prove that it was not prominent enough.").

Beyond that, Plaintiffs' expert undermines their argument. As Plaintiffs acknowledge, Dr. Oduor conceded that littering a product with "dozens and dozens" or warnings is unworkable. Opening.Br.32. Plaintiffs contend that does not matter because a "jury would only need to find that [DTNA] should've put this particular warning on its" product. *Id.* But the same could be said by any plaintiff in any case as to any warning. "It can always be argued that a single instruction should have been given more prominence," but that self-serving declaration does not withstand summary judgment. *Saenz*, 873 S.W.2d at 360; *see Broussard*, 433 So.2d at 358 ("Unless we should elevate the one hazard [plaintiff highlights] to premier importance above all others, we fear that an effort to tell all about each hazard is not practical either .... We decline to say that one risk is more worthy of warning than another."). Any contention that an on-product warning is required "must be considered in the context of the product involved" and where, "as here, it is important to give a number of instructions concerning the operation of a vehicle, not all of them can be printed on the dashboard." *Saenz*, 873 S.W.2d at 360. "[T]he more instructions and warnings that are printed in one place ... the less likely that any one instruction or warning will be noticed." *Id.* at 360-361.

*No proximate cause.* Plaintiffs' causation theories likewise fail.

*First*, as to the adequacy of the warning, Plaintiffs make no meaningful effort to contest the legal ground on which the district court rejected their claim—namely, that Leslie failed to read the Driver's Manual and so any deficiency in its content could not have proximately caused his injuries. That is dispositive on an inadequacy challenge as controlling law holds, which Plaintiffs, tellingly, do not address. *See supra* 27-28.[11]

*Second*, as for their criticism of how the warnings were communicated, Plaintiffs fail to show the district court erred in holding that they adduced no evidence that an on-product warning would have prevented Leslie from crashing the truck and suffering injury.

Plaintiffs were required to "introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." *Christopher v. Donna's Country Store*, 511 S.E.2d 579, 580 (Ga. App. 1999). "'A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty

---

[11] That includes Plaintiffs' case, *Camden Oil*. *See* 609 S.E.2d at 358-59 ("As Jackson did not read the warning, a jury should not be allowed to consider the adequacy of the contents of the warning as a basis for imposing liability").

of the court to grant summary judgment for the defendant.'" *Id.* (quoting *Head v. Sears Roebuck & Co.*, 503 S.E.2d 354, 355 (Ga. App. 1998).

So too here, as there is no evidence that an on-product would have made a difference—indeed, overwhelming evidence shows it would not. *See supra* 28-29. Plaintiffs, for their part, do not dispute the absence of any evidence that "Leslie would've done something different *after* the crash" had DTNA's warning been pasted in the cab. Opening.Br.34. Instead, they posit that "had [DTNA] reasonably warned Mr. Leslie of the danger, he wouldn't have taken on the risk in the first place[.]" *Id.* But no evidence supports that either. Leslie never testified that an on-product warning, reminding him of risks already known to a professional truck driver, would have caused him to abandon his 9-year career operating heavy trucks—all of which have the same, federally-approved fuel-tank placement and implicate the same risk of puncture in extreme collisions. *See supra* 7-9. Rather, the record shows Leslie knew that post-crash fires were a risk inherent to driving a 33,000-ton, fuel-powered vehicle and had even seen such fires, but nonetheless continued in his profession.

More still, the record belies any speculation that Leslie would have altered his behavior, as Leslie disregarded other protocols and common sense regarding safety—including to not text or talk on the phone while driving, protect against sun glare, reduce speed for such conditions, and maintain a safe distance.

40

*See supra* 3-4.[12] Thus, "based on his own actions on the day of the fire, one must conclude that he failed to heed [] clear, specific warnings and instructions," and that, too, reinforces the dearth of "evidence that any other warning or instruction [from DTNA] would have been heeded[.]" *Yarbrough v. Sears, Roebuck and Co.*, 628 So.2d 478, 482-83 (Ala. 1993) (affirming summary judgment); *see Bachtel v. TASER Int'l, Inc.*, 747 F.3d 965, 972 (8th Cir. 2014) (same, because user repeatedly "disregarded" training and instructions and thus "would not have read any additional warning"); *Hernandez v. City of Beaumont*, 742 F. App'x. 257, 259 (9th Cir. 2018) (unpublished) (rejecting argument that defendant "failed to warn of the particular danger of the [product], instead providing generalized, vague warnings of 'serious injury'" because "[t]here is no evidence, however, that stronger warnings would have altered [plaintiff's] conduct or use of the device") (unpublished).

"Unless [courts] were to hold [manufacturers] responsible for standing at [a product user's] shoulder" and ensuring that he "read any safety materials" and followed them, "any claim that [Leslie's] injury was proximately caused by the [DTNA's] failure to provide him with detailed safety information is too

---

[12] Plaintiffs' counsel below even stated: "There's no question that Mr. Leslie had some fault in causing the crash"; "[h]e was talking to his wife on the phone. The sun was in his eyes. He doesn't avoid this." R-329 at 43, 44-45.

speculative as a matter of law." *Niles*, 473 S.E.2d at 176.  Georgia law does not and "will not" impose liability based on such speculation, and this Court, sitting in diversity, cannot and should not expand state law.  *Id.*

***

The district court correctly granted summary judgment on Plaintiffs' warning claim.

## II.  The District Court Correctly Entered Summary Judgment On Plaintiffs' Negligent Design Claim

To overcome Georgia's 10-year statute of repose, Plaintiffs needed to present evidence showing DTNA acted with willful, wanton, or reckless disregard for life in designing its heavy truck.  They did not.

### A.  Georgia's Statute Of Repose And Its Willful, Wanton, And Reckless Designing Exception

Georgia's statute of repose bars product liability claims where the injury occurs "after ten years from the date of the first sale" of the product.  O.C.G.A. § 51-1-11(b)(2).  The statute "was enacted ... to address problems generated by the open-ended liability of manufacturers so as to eliminate stale claims ...." *Batten*, 450 S.E.2d at 212.

The 10-year bar is subject to a narrow exception:  a negligent design claim is not barred if the injury "aris[es] out of conduct which manifests a willful, reckless, or wanton disregard for life or property."  O.C.G.A. § 51-1-11(c).  As

42

the Georgia Supreme Court recently explained, the terms "willful," "wanton," and "reckless" "fall on a spectrum of culpable conduct, with willful conduct being the most culpable and reckless conduct being the least culpable." *Cosper*, 893 S.E.2d at 116. But each connotes serious misconduct that is "more culpable than negligence and … involve[s] a high risk of harm." *Id.*

First, "willful" conduct involves "an actual intention to do harm or inflict injury." *Id.* at 111 (citation omitted). Next, "wanton" behavior, though lacking "an actual intent to harm," is conduct "so reckless or so charged with indifference to the consequences as to be the equivalent in spirit to actual intent." *Id.* at 116, 111 (citation omitted). Finally, "reckless" conduct occurs when a defendant

> intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable person to realize that the actor's conduct not only creates an unreasonable risk of harm to another's life or property but also involves a high degree of probability that substantial harm will result to the other's life or property.

*Id.* at 118-19. Thus, "recklessness requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man[.]" *Id.* at 118 (citation omitted). But even a conscious and knowing choice

is not enough—the choice must also involve "a high degree of probability that substantial harm" will ensue. *Id.* at 118-19.

The plaintiff bears the burden of showing that the exception applies. *Ivy*, 646 F.3d at 773. At the summary judgment stage, the plaintiff must come forward with actual *evidence* of highly culpable conduct creating a high probability of substantial harm. *See Watkins*, 190 F.3d at 1217. That burden is not met by "after-the-fact expert opinion that a product is defective," *Ivy*, 646 F.3d at 777, or by evidence that fails to speak to actual culpability in designing a product, *see Batten*, 450 S.E.2d at 212.

The analysis, moreover, must keep in mind fundamental principles governing products cases, including that "a manufacturer is not an insurer that its product is, from a design viewpoint, incapable of producing injury." *Banks v. ICI Americas, Inc.*, 450 S.E.2d 671, 675 (Ga. 1994); *see also Exxon*, 433 S.E.2d at 352 (manufacturer is not "insurer with respect to product design" and not required to "make a [product] accident proof or foolproof, or even more safe") (citing *Weatherby*, 393 S.E.2d 64). The law sensibly imposes no such burden, for "virtually any article, of whatever type or design, is capable of producing injury when put to particular uses or misuses[.]" *Hunt v. Harley-Davidson Motor Co.*, 248 S.E.2d 15, 17 (Ga. App. 1978) (citation omitted).

**B. Uncontroverted Record Evidence Shows DTNA Did Not Recklessly, But Instead Carefully And Conscientiously, Design Its Heavy Truck.**

Plaintiffs' case centers on their contention that DTNA engaged in reckless conduct. Opening.Br.35-48. Based on a careful examination of the evidence and expert opinions, the district court correctly concluded Plaintiffs' claim was barred by the statute of repose because they had no evidence on which a reasonable jury could find that DTNA created an unreasonable risk of harm that involved a high probability of substantial injury. Instead, undisputed evidence showed that DTNA carefully designed its truck, going above and beyond applicable safety standards, to address the risk of post-crash fires.

In the United States, heavy trucks carry cargo thousands of miles and, as a result, require large fuel tanks. Those tanks, consistent with federal regulations, are placed outside the trucks' frame rails. 49 C.F.R. § 393.67(e). Every heavy truck in America, both when the subject truck was sold through today, uses this design. R-267-4 at 5 (Herbst Dep.)

Heavy truck design, including the inherent risk of post-crash fire in 33,000-pound fuel-powered vehicles, was extensively studied by the NHTSA and industry leaders like DTNA in the Maryland Study—the most comprehensive study ever of post-crash fires. R-267-4 at 4 (Herbst Dep.). As a participant in the Study, DTNA helped evaluate risks and ways to mitigate post-crash fire

45

dangers. R-267-3 at 3-4 (Moore Dep.). The Study considered, among other things, the feasibility of relocating the fuel tanks, but after careful analysis, it was determined that a "less vulnerable position is not apparent, given the present design of heavy trucks and the need for relatively large fuel tanks." R-267-8 at 114.

DTNA relied on and incorporated the Maryland Study's results in designing its truck. As the district court noted, "[w]hile fuel tank relocation was not considered a viable option in designing its trucks, [DTNA] made many design changes as a result of the 1989 Maryland Study in an effort to reduce the risk of post-crash fuel-fed fires." R-337 at 8; *see also* R-267-3 at 5-7 (Moore Dep.). DTNA redesigned the entire fuel system by "(1) improv[ing] thermal fuel tank venting, (2) reduc[ing] tank diameters to increase ground clearance, (3) increas[ing] tank strength to exceed federal safety standards, (4) increas[ing] tank wall thickness, (5) increas[ing] tank strength through the use of new alloys, (6) redesign[ing] fuel tank mounting brackets, (7) relocat[ing] fuel transfer lines to the top of the tank, (8) [creating] a tank support system that reduced the risk of rupture in a collision, and (9) ... moving ... other truck components away from the fuel tanks to reduce the risk of tank puncture during a collision." R-337 at 8 (Op.) (citing R-267-3 at 5-8).

Moreover, both before and after the Maryland Study, DTNA continuously evaluated ways to reduce fires. R-337 at 7 (Op.). For example, even though government regulations do not require full-scale crash tests, DTNA performed four full-scale tests and incorporated their results into further risk mitigation design changes. *Id.* 9 n.2; R-267-1 at 6-7 (MSJ Br.); R-267-3 at 13-14 (Moore Dep.).

In sum, uncontroverted evidence showed DTNA proactively implemented safety-enhancing designs, subjected its trucks to rigorous safety testing beyond federal mandates, and considered "a broad spectrum of information," including "government studies, statistics, analysis of competitive vehicles, [and] information from industry groups," R-337 at 8 (Op.). Undisputed evidence demonstrates DTNA "designed the subject truck's fuel tank system with the intent to reduce the risk [of post-crash fires], and made many design changes to reduce that risk." *Id.* at 21 (Op.). Plaintiffs, for their part, were unable to controvert what the record showed and thus failed to carry their legal and evidentiary burden of establishing that DTNA knowingly created an unreasonable risk of harm to life and that a conscious choice resulted in a high degree of probability that substantial harm. *Id.* at 20-21 (Op.) (citing *Cosper*, 893 S.E.2d at 118-19).

### C. Plaintiffs' Recklessness Theories Fail As A Matter Of Law And Fact

Plaintiffs agree the statute of repose bars their claim unless they can show reckless conduct. *See* Opening.Br.10. Their effort to meet that standard is based on three contentions: (1) DTNA did not conduct a Failure Modes and Effects (FMEA) "or any similar analysis to reduce the risk of post-collision fuel-fed fires;" (2) DTNA "was aware of, but rejected, several safer alternative designs" theorized by Plaintiffs' expert; and (3) there have been 72 similar instances of heavy truck fires. Opening.Br.37-38. The evidence does not support any of these contentions and all fail as a matter of law.

*First*, undisputed evidence belies Plaintiffs' contention that DTNA's design process did not include a FMEA or any similar analysis. The Maryland Study, in which DTNA participated and incorporated its findings in designing its truck, *was indeed* a FMEA. R-267-8 at 92 ("In this study, two techniques are applied: Failure Modes and Effects Analysis (FMEA) and Fault Tree Analysis."); *see also id.* at 98. Even Plaintiffs' expert concedes as much. R-267-18 at 3-4 (Dunn Dep).

In any event, a FMEA is not required by any federal or industry standard, *see* R-268-1 at 49, 54 (Dunn Dep.), and is just one of several ways of performing "a brainstorming session to identify any *potential* failure modes."

*Nease v. Ford Motor Co.*, 848 F. 3d 219, 226 (4th Cir. 2017) (citation omitted); *see* R-267-17 at 13-17 (Dunn Dep., admitting there are other methods). And the uncontroverted evidence shows that in addition to the Maryland Study, DTNA performed other risk assessments above and beyond federal standards and used its collective learnings to improve its design. *See supra* 10.

Plaintiffs, for their part, have never pointed to even one "published opinion where the absence of a formal FMEA documentation supports [a] finding of 'willful, reckless, or wanton conduct' by a manufacturer." R-337 at 10 (Op.). Nor have they proffered any evidence that an additional FMEA would have resulted in a materially different design. *See* R-267-17 at 18 (Dunn Dep., conceding he could not say whether this would have resulted in a different design); R-337 at 14 (Op.).

Thus, for reasons—both factual and legal—Plaintiffs' "no-FMEA" argument fails to establish recklessness.

*Second*, Plaintiffs' contention that DTNA was reckless because it supposedly rejected safer alternative designs fails, because they did "not establish[] that there was a feasible alternative" design. R-337 at 15 (Op.); *see Woods v. A.R.E. Accessories*, 815 S.E.2d 205, 209 (Ga. App. 2018) ("[L]iability for defective design attaches *only* when the plaintiff proves that the

seller failed to adopt a reasonable [viable], safer design that would have reduced the foreseeable risk of harm") (quoting *Banks*, 450 S.E.2d at 674 n.4).

As the undisputed evidence shows, no safer, technologically feasible fuel system existed in the 1990s when the truck was designed or in 2005 when it was first sold—or even today. R-337 at 20 (Op.). With no alternative design ever having been used in any American truck, Plaintiffs argue DTNA was reckless because it did not adopt ***purely theoretical*** design concepts their paid litigation expert, Brian Herbst, imagined—and which, as Herbst admitted, have not been tested (by himself or anyone else), engineered, or adopted in any truck in America. R-73 at 8 (Herbst Report).

Herbst—who never has done any design work on heavy trucks, R-305-3 at 3 (Herbst Dep.)—speculated DTNA could have: (1) added a heavy, steel beam-reinforced structure behind the factory bumper that, according to Plaintiffs, "prevents underride and engages the energy absorbing structures of passenger cars," *id.* at 34; (2) used tethers with "high strength fibers" to "secure the front axle assembly to the frame in order to limit axle displacement and absorb energy during a crash," *id.* at 44; (3) moved the fuel tank behind the tractor's cab or inside the frame rail, *id.* at 46-47; or (4) added fuel tank guards to protect side-mounted fuel tanks, *id.* at 49; *see* Opening.Br.7. But Plaintiffs did not show that any of this was or is feasible—as Herbst's own testimony shows.

50

***Steel reinforced structure.***  Herbst opined a heavy, steel-beam reinforced structure behind the factory bumper, used in European and Australian trucks, could be used in American trucks.  R-73-4 at 40.  But American trucks are different from European and Australian trucks, *see* R-268-8 at 226 (Moore Report), R-268-8 at 187 (Moore Dep.), R-268-6 at 146-47 (Herbst Dep.); R-329 at 23-24 (MSJ Tr.), and even Herbst conceded the use of his proposed design on an American truck is—to this day—merely a theoretical idea, never adopted, and more engineering and testing would be needed before it ever could be.  R-268-7 at 114-15 (Herbst Dep.); *see also* R-268-6 at 56, 58 (Herbst Dep., admitting he was unaware of any U.S. truck that ever used this design).  Moreover, Herbst's report also shows that Australia did not require its trucks to be equipped with such a structure until 2012, long after DTNA's truck was designed and sold.  R-73-4 at 36; *see Bryant v. Hoffmann-La Roche, Inc.*, 585 S.E.2d 723, 733 (Ga. App. 2003) ("product can be found defective upon proof that, ***at the time the product was manufactured***, a reasonable alternative design could have been used") (emphasis added) (citing *Banks*, 450 S.E.2d at 674-75).

***Tethering.***  Herbst next theorized that the American heavy truck industry could use tethering systems akin to those used in a Formula One car—a single-seat, open-cockpit, racing car.  Conspicuously absent from Herbst's report, however, is any ***evidence or testing*** (by him or anyone else) ***showing*** that a

tethering system was safe or technologically feasible in a heavy truck. R-73-4 at 43-44 (Herbst Report); R-268-7 at 20 (Dep., admitting he never conducted any testing).

*Moving the fuel tank location.* No alternative fuel tank placement is feasible or safer—a reality evidenced by the Maryland Study and echoed in federal regulations.[13] *See supra* 7-8; *see also* R-268-5 at 113 (Dunn Dep.) (agreeing "a less vulnerable position is not apparent," and explaining that moving fuel tanks "behind the cab … might result in new breach mechanism during jackknife accidents" and moving them "inboard" would require "fill pipes" that "could prove to be a point of fuel system vulnerability that does not exist at present"). Herbst's contrary suggestion is not built on any safety or feasibility testing. R-268-6 at 284 (Herbst Dep.).

---

[13] Plaintiffs fault the district court for "granting summary judgment based on industry practices or federal regulations." OpeningBr.42. But it simply noted DTNA's compliance with these standards as one fact among many reinforcing the absence of any evidence of recklessness. *See Ivy*, 646 F.3d 769 (statute of repose exception not met in part because product "passed the Consumers Union Test, … received a recommendation in Consumer Reports, … and performed well on the tests NHTSA determined were most appropriate"). Unlike in *Walden* on which Plaintiffs rely, DTNA does not argue, and the district court did not conclude, it is entitled to a directed verdict "simply because [it] complied with the federal standard[.]" *Chrysler Grp., LLC v. Walden*, 792 S.E.2d 754, 761 (Ga. App. 2016) (overruled in part by *Cosper*, 893 S.E.2d at 119 n.7).

***Fuel tank guards.*** While Herbst opined that DTNA could use fuel tank guards—essentially a cage around the fuel tanks, R-73-4 at 49—he conceded both that he was unaware of any American heavy truck that has ever used such a cage and that such guards would create new risks and additional impact points that could puncture the fuel tank. R-268-6 at 279, 252 (Herbst Dep.). Thus, this theory, too, is merely an unproven design concept and more engineering and testing would be needed before it could be safely used, as Herbst acknowledged. *Id.* at 254; R-268-7 at 114 (Herbst Dep.).

As the district court correctly concluded, Plaintiffs failed to adduce ***any*** evidence that DTNA selected its current design over technologically feasible, safer alternatives because Plaintiffs did not prove that one existed in the first place. They identified no alternative used by another manufacturer, and Herbst's speculative design concepts did not clear the evidentiary bar. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (expert opinion "not supported by sufficient facts," "contradict[ed]" by "indisputable record facts," or is "unreasonable" cannot support a jury verdict); *Weisgram v. Marley Co.*, 528 U.S. 440, 445-46 (2000) (judgment as a matter of law warranted where expert testimony, the sole evidence supporting product defect claim, was "speculative and not shown to be scientifically sound").

***Third***, no recklessness is shown by the fact that 72 instances of fuel-related fires in Class 8 trucks occurred over a 27-year period. What simple arithmetic shows—and Plaintiffs fail to mention—is that the incidence of fire is extremely low—occurring in only 0.005% of the approximately 1.4 million Freightliner trucks manufactured between 1990 and 2017, which collectively travel 100 to 200 billion miles across the U.S. each year. R-293-3 at 28 (Moore Dep.).

The fact that fires occur in 0.005% of trucks does not establish recklessness. Any ruling to the contrary would violate long-settled Georgia principles that product manufacturers are not the insurers against any possible product-related injury. *Banks*, 450 S.E.2d at 675; *see supra* 44. A "post-crash fire," as the district court explained, "is an inherent risk in all fuel-powered vehicles." R-337 at 21. Indeed, Plaintiffs' expert agrees it is "impossible to devise a fuel system on a diesel powered heavy truck" that is "crash proof or leak proof." R-268-6 at 263; *see also id.* at 61. Herbst is in good company in that regard. *See Linert v. Foutz,* 75 N.E.3d 1218, 1222 (Ohio 2016) (noting plaintiffs' expert "conceded that there is a risk of postcollision fire for all vehicles, regardless of where the fuel tank is located, and that no fuel system is guaranteed to be leak-proof in a high-speed, rear-impact collision, no matter how 'solid' the design of a fuel system or the placement of the fuel tank in the vehicle.").

54

Nor is recklessness shown by the fact that DTNA was unable to completely eradicate the risk. *See* Opening.Br.40 (arguing that "the danger of post-collision fuel-fed fires remained" because some of DTNA's crash tests showed fuel tank puncture). This too is an attempt to move the goalpost. It was *Plaintiffs'* burden to come forward with evidence of recklessness conduct—a demanding standard requiring *both* a conscious choice to disregard a serious danger and a high degree of probability that substantial harm to life with follow as a result—*not* DTNA's burden to show it insured against all risk through a 100% fire-proof truck or that each design enhancement "actually reduced the danger." Opening.Br.40; *see supra* 43-44.

Beyond that, Plaintiffs neglect to mention that after the crash tests, DTNA implemented even more safety enhancements to mitigate fuel tank impacts. R-267-10 at 6-7 (Moore Dep.). That included the "introduction of a military wrap on multileaf springs," *id.* at 6, and a "design change so that there was no longer a bolt protruding in [the] area that could contact the [fuel] tank," *id.* at 7. In fact, DTNA made changes to address every issue that arose during the crash tests. *Id.* (when asked whether "design changes [were] made to address [fuel leakage] issues," DTNA responded: "Yes, *in every case*.") (emphasis added). While Plaintiffs dismiss DTNA's efforts as "superficial design changes," Opening.Br.41, their *ipse dixit* falls far short of meeting their burden to adduce

actual evidence of reckless conduct. And their reliance on easily distinguishable cases fares no better.[14]

In keeping with their mishandling of the case law, Plaintiffs incorrectly suggest this case is similar to *Watkins* and *Walden*. Opening.Br.39. But these cases only further support DTNA, illustrating the type of evidence needed to meet the heightened degree of culpability necessary to overcome the statute of repose—evidence that is ***entirely missing*** here. *See Watkins*, 190 F.3d at 1217-19 (plaintiffs adduced evidence that Ford Bronco had a rollover rate 3.5 times that of other SUVs and despite Ford's engineers submission of "five proposals" to improve stability, management "selected the least expensive proposal, resulting in a vehicle that was even less stable"); *Walden*, 792 S.E.2d at 761 (plaintiffs adduced evidence "Chrysler knew that locating fuel tanks midship provided safety benefits, [and] that it was possible to locate the fuel tank in the

---

[14] *See Taylor v. Devereux Found, Inc.*, 885 S.E.2d 671, 682, 704-05 (Ga. 2023) (plaintiff adduced substantial evidence employer acted with "an entire want of care" and "conscious indifference to consequences," including employee admissions on lack of training, knowledge its training practices were inadequate, and failure to implement its own recommended hiring and training practices) (citation omitted); *Ponce de Leon Condos v. DiGirolamo*, 232 S.E.2d 62, 64 (Ga. 1977) (defendant expressly rejected plaintiff's complaints of water runoff due to increased costs and made no effort "to lessen the quantity of water being discharged"); *Jones v. Bebee*, 839 S.E.2d 189 (Ga. App. 2020) (evidence supported punitive damages where adult dog-owners left "vicious" dog alone with injured 11-year-old son and failed to protect mail carrier on day of attack).

1999 Grand Cherokee midship" but failed to do so). By contrast, the uncontroverted record evidence shows that DTNA worked to design a safe truck by participating in the most comprehensive safety study ever done; redesigning the truck in response to its findings; performing even further testing not required by any regulatory authority; making additional safety enhancements as a result; and producing a truck that is driven over 100 billion miles a year on high-speed highways and yet only a fraction of a fraction of a percent of those trucks have caught fire over three decades.

* * *

Plaintiffs end their brief by faulting the district court for relying on this Court's precedent in *Ivy*, which they call not "binding or relevant" because *Ivy* considered the willful and wanton standards—not the less culpable reckless standard—under the statute of repose. Opening.Br.47. Their criticism is neither accurate nor fair.

True, *Ivy* did not address or treat recklessness as a "stand alone exception" and did not set forth a standard for recklessness, and so, those questions were certified to the Georgia Supreme Court, *Cosper v. Ford Motor Co.*, 2023 U.S. LEXIS 40138, at *19 (N.D. Ga. Feb. 14, 2023), which clarified that recklessness is a standalone exception and elucidated its standard. *Cosper*, 893 S.E.2d 106. But no error can be shown from that because the district court

faithfully followed and applied *Cosper*—treating recklessness as standalone and applying the test *Cosper* established. *See* R-337 at 17-18, 20-21 (Op.).

The district court also properly relied on *Ivy*'s informative reasoning that no jury question exists where the only evidence of culpable conduct is an after-the-fact expert opinion. *See* R-337 at 19 ("[T]he mere fact that some expert might develop an after-the-fact opinion that the vehicle is defective is not sufficient to create a genuine issue of material fact as to whether [the defendant] was willful and wanton with respect to marketing the vehicle.") (quoting *Ivy*, 646 F.3d at 777). Nothing in *Cosper* calls that principle into question—and there is no reason it would not apply to a recklessness analysis. The principle is well-rooted in U.S. Supreme Court precedent holding that the mere existence of an expert opinion cannot support a verdict when the "opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable[.]" *Brooke Group Ltd.*, 509 U.S. at 242.

Though their attempt to discount *Ivy* fails, it is not surprising that Plaintiffs make the effort. *Ivy* sharply reinforces that Plaintiffs have not created a factual dispute on the statute of repose exception. While there is overwhelming, undisputed evidence that DTNA carefully designed the subject truck to reduce the risk of post-crash fires, "the only significant evidence adduced by" Plaintiffs

to the contrary is after-the-fact expert opinion. *See Ivy*, 646 F.3d at 777. But as

in *Ivy*, Plaintiffs' expert, Herbst, "generally oversimplifies a problem" that the

scientific, engineering, trucking industry has been studying for decades. *Id.* at

777. That is "not sufficient" to withstand summary judgment. *Id.*

## CONCLUSION

DTNA is sympathetic to the "tragic" consequences of this accident. *White

v. Ga. Power Co.*, 595 S.E.2d 353, 356 (Ga. App. 2004). But "application of

[settled] doctrine to the present case" reveals no "cause of action to recover"

against DTNA under "the binding law of Georgia." *Id.* The district court

rightly adhered to those dictates and its decision should be affirmed.[15]

---

[15] Because Plaintiffs' substantive claims fail as a matter of law, the district court correctly concluded that the "derivative claims for loss of consortium and punitive damages must fail as a matter of law." R-337 at 29. Plaintiffs agree that these claims rise and fall on their substantive claims. Opening.Br.11.

DATED: September 16, 2024        REED SMITH LLP

By: */s/ Kim M. Watterson*
Kim M. Watterson
Ted A. Hages
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222-2716
Telephone: +1 412 288 3131
kwatterson@reedsmith.com

Richard H. Grafton
GERMER BEAMAN & BROWN PLLC
One Barton Skyway
1501 S Mopac Expy, Suite A400
Austin, TX 78746
Telephone: +1 512 472 0288
rgrafton@germer-austin.com

Barbara A. Marschalk
Stevan A. Miller
DREW ECKL & FARNHAM, LLP
303 Peachtree Street NE
Suite 3500
Atlanta, GA 30308
Telephone: +1 404 885 1400
marschalkb@deflaw.com
millers@deflaw.com

Jeffrey E. Tompkins
THOMAS KENNEDY SAMPSON &
TOMPKINS LLP
3355 Main Street
Atlanta, Georgia 30337
Telephone: +1 404 688 4503
jtompkins@tkstlaw.com

*Attorneys for Appellee-Defendant*
*Daimler Truck North America LLC*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,913 words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 11th Cir. Rule 32-4.

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately-spaced typeface using Microsoft Word in CG Times font, 14-point type.

DATED: September 16, 2024

*/s/ Kim M. Watterson*
Kim M. Watterson

# CERTIFICATE OF SERVICE

I certify that, on September 16, 2024, I electronically filed **Appellee's Brief** with the clerk of the court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system. A courtesy paper copy will be mailed out via U.S. Postal Mail.

I further certify that the below participant(s) in the case are not registered appellate CM/ECF user(s) and were served via U.S. Postal Mail on this date at the addresses listed below.

Ronnie L. Crosby
PARKER LAW GROUP
101 Mulberry Street, E.
PO Box 487
Hampton, SC 29924

Samuel K. Morgan, Jr.
MORGAN LITIGATION GROUP, LLC
135 E Main Street
Lexington, SC 29072

I further certify that four paper copies were sent on this date to the Eleventh Circuit Court of Appeals via UPS overnight courier at the address listed below:

Eleventh Circuit Court of Appeals
Administrative Offices
96 Poplar Street, N.W.
Atlanta, GA 30303

*/s/ Kim M. Watterson*
Kim M. Watterson